**ESTEE LAUDER, INC., Plaintiff,**

v.

**THE GAP, INC. d/b/a Old Navy Clothing Company, Defendant.**

**No. 96 Civ. 4130 (LAK).**

United States District Court, S.D. New York.

July 22, 1996.

Arthur J. Greenbaum, Joshua Paul, Richard S. Mandel, Cowan, Liebowitz & Latman, P.C., New York City, for Plaintiff.

Jerome B. Falk, Jr., Annette L. Hurst, Howard, Rice, Nemerovski, Canady, Falk & Rabkin, San Francisco, CA, Peter Jakab, Fein & Jakab, New York City, for Defendant.

## OPINION

KAPLAN, District Judge.

Estee Lauder Inc. ("Lauder") recently introduced a new skin moisturizer which, depending upon which of the parties is speaking, is called either "100%" or "100% Time Release Moisturizer." The defendant, The Gap, Inc. ("Gap"), is about to launch a line of personal care products in its Old Navy ("Old Navy") clothing stores under the umbrella name, "100% Body Care." Lauder seeks to enjoin Gap from doing so, claiming that Gap's use of "100% Body Care" infringes Lauder's trademark as applied to goods of this character. This is the Court's decision following a bench trial.

### The Genesis of the Dispute

#### The Parties

The Estee Lauder Companies are among the leading skin care, makeup and fragrance companies in the world. They consist of Lauder, the plaintiff in this case, as well as Clinique, Prescriptives, Origins, Aramis and other entities. Their total worldwide sales in fiscal 1995 were approximately $2.9 billion, of which slightly less than half were made in the United States. (PX 1,[1] ¶ 4)

Lauder produces makeup, fragrance products, and a wide array of skin and other personal care products. It currently sells face care products, body lotions, shampoos, hair conditioner, hair spray, sun care products, eye cream, moisturizing products, antiperspirants, among other products. (Id. ¶ 5) Its total sales of skin and other personal care products in the United States last year exceeded $225 million, and it spent over $30 million on advertising and marketing support. (Id.)

Gap is an international retailer of apparel and other products. It sells through its own well-known retail stores—Gap, GapKids, Banana Republic, Old Navy and, most recently, Baby Gap. (DX EEE–HHH) Old Navy, the chain at issue in this case, was created in 1992 in consequence of marketing studies that revealed that approximately one-half of the domestic apparel market consisted of sales in a market segment in which Gap was not represented, a segment that Gap refers to as the mass middle market. (DX BBBB[2] ¶¶ 4–6) The segment is characterized, according to Gap, by real estate format (stores located in strip malls and so-called power centers as distinguished from free-standing metropolitan department stores and regional enclosed shopping malls), customer income in the $30,000 to $70,000 range, and retail prices. (Id. ¶¶ 5, 9–13)

### The Products and Name Selections

The record reveals that the parties independently began the process that resulted in each selecting the name "100%" for its products. Once the initial decisions were made, however, their efforts to clear use of their preferred mark yielded a sketchy outline of the conflict that now has matured. As time went by, the picture became clearer, especially to Gap, but the parties continued on a collision course.

---

1. As this case was tried to the Court, the direct testimony of the witnesses was taken in writing and the witnesses then tendered for cross-examination. PX 1 is the direct testimony of Dianne Osborne, vice president—skin care marketing of Estee Lauder U.S.A. and Canada, a division of Lauder.

2. DX BBBB is the direct testimony of Warren Hashagen, a senior vice president and chief financial officer of Gap.

*Gap's Initial Efforts*

Gap began considering the introduction of personal care products in its major divisions at least as early as late 1993 and hired Gary McNatton to develop such lines in February 1994. (DX CCCC[3] ¶ 1) McNatton's group began development of a personal care line for Old Navy in approximately December 1994, after first having done so for the Gap and Banana Republic stores. (*Id.* ¶¶ 5, 9) In August 1995, McNatton, who "had a good idea of which products [he] would include" in the line, began to focus on their identifier. (*Id.* ¶¶ 9–10) By September or October, he settled on the percentage sign ("%") as his preferred symbol and decided that he would like to use "100%" for the line. (*See id.* ¶¶ 11–12)

*Lauder's Initial Efforts*

During 1995, Lauder started planning to introduce in the spring of 1996 a new skin moisturizer product in lotion form because skin moisturizing lotions are among the most popular skin treatment products with women. The new product incorporates over 70 minerals and delivers moisture to the skin over an extended period through a trademarked moisture delivery system called "Aqua-Spheres." (PX 1, ¶¶ 6–7)

In November or December 1995, Lauder's creative group considered a number of possible trademarks for the new product. Exactly what that group decided is a matter of some dispute. According to Dianne Osborne, Lauder's vice president—skin care marketing, she decided to adopt "100%" as the trademark because it "would suggest to consumers certain attributes of" the product— its long lasting quality and the notion that it is the best such product available. (*Id.*, ¶ 8) Gap, on the other hand, points to Lauder internal documents that refer to the product as "100% Time Release Moisturizer" to support its contention that this longer phrase, rather than "100%" standing alone, is the trademark and that Lauder so intended until it took its present position for litigation purposes. As indicated below, the question whether "100%," standing alone, is a trademark or used in a trademark sense does not depend upon Lauder's intentions, which are no more than circumstantial evidence of likely consumer perception. Accordingly, no definitive conclusion need be reached as to Lauder's intention, if indeed Lauder may be said to have had any.

*The Trademark Searches and the Dana Contacts*

In September or October 1995, McNatton's group at Gap asked Julie Kanberg, Gap's in-house trademark counsel, to determine the availability of "100%" as a trademark for personal care products to be sold in Old Navy stores. (DX CCCC ¶ 12; DX DDDD[4] ¶ 3) Ms. Kanberg promptly discovered that the trademark "100% HUNDRED PER CENT." had been registered with the United States Patent and Trademark Office ("PTO") for toilet preparations, perfumery, and cosmetics by Les Parfums de Dana, Inc. ("Dana"). (DX DDDD ¶ 4) She then consulted outside counsel and commissioned a private investigator to determine whether Dana used the mark. (*Id.* ¶ 5)

While Gap was attempting to learn whether Dana had any rights in the mark 100%, Lauder started down the same path and, in fact, overtook Gap's efforts. On December 13, 1995, Lauder's legal department ordered a trademark search report and promptly discovered the Dana registration. (PX 45,[5] ¶ 4) While still unable to determine with certainty whether Dana's mark was in use, Lauder, on December 20, 1995, filed an application with the PTO to register "100%" on an intent-to-use ("ITU") basis as a trademark for cosmetics, toiletries and fragrances.[6] (*Id.* ¶¶ 5–6; PX 47) On January 11, 1996, just a few weeks later, Kanberg, who did not yet know anything of Lauder's plans or of Lauder's ITU application, filed ITU applications to

---

3. DX CCCC is the direct testimony of Mr. McNatton.

4. DX DDDD is the direct testimony of Ms. Kanberg.

5. PX 45 is the direct testimony of Lido L. Puccini, associate counsel in Lauder's legal department, who is responsible for matters concerning trademarks.

6. As of July 3, 1996, the application had not yet been examined by the PTO. (PX 45, ¶ 6)

register "100%," "100% BODY CARE" and "100% BODY CARE AND DESIGN."[7] (DX DDDD ¶ 6)

Given Lauder's uncertainty as to whether Dana was using the "100% HUNDRED PER CENT." mark, Lauder opened discussions with John Jackson, Dana's general counsel, with a view to obtaining an assignment of Dana's rights. In the meantime, Gap's investigator reported back that Dana had abandoned its mark. (DX DDDD ¶ 5) Nevertheless, Kanberg, concerned that the Dana registration would block her own applications, asked her investigator to seek an assignment from Dana. (*Id.* ¶ 7)

Dana suddenly was confronted with an embarrassment of potential riches—two bidders for an abandoned[8] trademark registration— and sought to take advantage of the situation. When contacted on behalf of Gap, Dana's Mr. Jackson disclosed that there was another bidder and, although it did not identify Lauder by name, reported to Gap's investigator that it "was a high-end cosmetics company" that was "on the road to production."[9] (Kanberg Dep. 86–87) Kanberg made no effort to identify the other bidder and, thinking the figures mentioned by Jackson too high, broke off discussions with Dana. (*Id.* 83–90) In late February, however, Gap made one last attempt to procure the Dana registration. In the course of settling an unrelated dispute, it sought to have Dana include its registration in the deal but learned that the registration already had been assigned. An on-line search for the assignment revealed, on February 27, 1996, Lauder's December 20, 1995 ITU application. (DX DDDD ¶ 11) Thus, the Court finds that Gap, as of February 27, 1996, knew not only of Lauder's ITU application, but knew also that Lauder had acquired the Dana registration and was the "high end cosmetics company" that was "on the road to production" of a new product or products using "100%" as its trademark.

*The Subsequent Applications*

At this point, caution might have suggested that Gap discuss the looming conflict with Lauder. Gap, however, first sought to improve its position.

On March 7, 1996, Ms. Kanberg requested a further trademark search. (DX DDDD ¶ 12; DX RRR) Finding that Lauder had not amended its December 1995 ITU application to allege use, she filed a number of additional ITU applications on behalf of Gap on March 12, 1996. (DX DDDD ¶¶ 12, 10; DX LLL) These additional applications consisted of "100%" followed by another word or phrase, most of them being the generic name of a product, such as "100% Body Scent." (DX LLL)

Ms. Kanberg asserts that Gap had decided that it would not proceed with "100%" alone if Lauder objected and that she had no knowledge of any actual use by Lauder upon which Gap would infringe with the proposed uses in Gap's ITU applications. (DX DDDD ¶¶ 12, 15) That no doubt is so.[10] Nonetheless, the Court finds that Gap, knowing that Lauder had a new "100%" product in the pipe line, embarked on a race to be the first to use a "100%" mark and that Gap's March 12, 1996 ITU applications were designed to place Gap in the strongest possible position to preempt Lauder from using any "100%" mark if Gap won the race to first use.[11]

---

7. The applications were filed on behalf of GPS (Delaware), Inc., a Gap subsidiary. The parties have stipulated that GPS (Delaware), Inc. will be bound by the judgment in this case. (Tr. 4)

8. The parties now agree that Dana's mark had been abandoned.

9. Within a day or so, Jackson called Lauder to spark the bidding, leaving a message to the effect that Lauder was not alone in seeking the assignment. (PX 45, ¶ 9; PX 48) Within days, Lauder purchased the assignment for $20,000, although it ultimately conceded that it derived no rights from it because it cannot prove recent use. (PX 45, ¶ 10)

10. In fact, Gap withdrew its ITU application to register "100%" in June 1996 after discovering Lauder's December 1995 application. (DX DDDD, ¶ 15; DX OOO)

11. The withdrawal of Gap's application to register "100%" is not inconsistent with this view. It continued with its applications to register "100% BODY CARE" and "100% BODY CARE & DESIGN" and filed the new applications referred to in the text. The Court finds that Gap did not believe that the phrases "body care" and "body care & design" were protectible and that Gap's overall position was intended to protect its right to use a mark including "100%" and, if need be, to exclude Lauder from doing so.

### The Contacts Between Lauder and Gap

Having staked out Gap's position, Ms. Kanberg telephoned Lesley Moradian, the Lauder attorney whose name was on Lauder's ITU application, on March 13, 1996. Moradian indicated that she was aware of Gap's January ITU applications for 100% and 100% BODY CARE and stated that Lauder was about to launch a new product using the 100% mark standing alone, that it was planning an entire line of skin care products using that mark, and that it might have a problem with one or both of Gap's applications.[12] (DX DDDD ¶14; *see also* DX F) Ms. Kanberg suggested that the parties exchange proposed product packaging in an effort to avoid any trade dress problem, but Ms. Moradian declined. (DX DDDD ¶14)

On the following day, Ms. Kanberg wrote to Ms. Moradian. Her letter had several purposes. First, she wished to confirm that Lauder intended to use "100%" by itself and to state that Gap would not use "100%" apart from the words "BODY CARE." (DX F) Second, she renewed Gap's offer to exchange proposed packaging to ensure that there would be no confusing trade dress. (*Id.*) Finally, she put Lauder on notice of her position that Dana had abandoned use of its mark and that Lauder therefore acquired no rights by the assignment. It is significant to note, however, that Ms. Kanberg, Gap's experienced trademark counsel, referred to Lauder's "100%" as "suggestive" (DX F, at 1566), a term of art in the trademark field of no mean significance.[13] Indeed, she testified at trial that she believes that "100%" standing alone is suggestive and protectible absent proof of secondary meaning. (Tr. 170–71)

On March 25, 1996, Ms. Moradian responded. She raised the question whether "the use of the term 100% by The Gap infringes Estee Lauder's prior rights in the trademark 100%." (DX G) In addition, she provided specimens of Lauder's proposed trade dress and stated that her letter was "written and the enclosed information ... furnished in the context of settlement discussions and with the understanding that it may not be used in any litigation ..." (*Id.*) There ensued a variety of discussions between the two com-

---

12. While a portion of Ms. Kanberg's testimony is sufficiently ambiguous to suggest that Ms. Moradian was aware of all of Gap's applications (DX DDDD ¶14) ("one or more of our applications"), the Court finds both from other statements by Ms. Kanberg and from the fact that all but two of Gap's ITU applications were filed only the day prior to the telephone conversation that Ms. Moradian was aware only of the January 11 applications.

13. Ms. Kanberg, for obvious reasons, now seeks to retract or undercut the admission she thus made. She argues that she used the word "suggestive" because she had "come to the conclusion that the best Lauder could claim in the abstract was that the mark was suggestive" and that she concluded, immediately upon seeing Lauder's product and packaging design some weeks later, that its actual use was descriptive. (DX DDDD ¶¶16–17; *see* Tr. 168–71, 176–77) The argument is at best marginally persuasive. Ms. Kanberg was an experienced trademark attorney who at all times aggressively sought to maximize her client's claim to rights in a 100% mark. The Court does not accept that one in that position would characterize her adversary's putative mark as suggestive rather than descriptive unless that genuinely reflected her view, as there would be no reason to surrender the point to an adversary. To put it another way, one seeking to establish a negotiating position would avoid characterizing the adversary's position in terms that were "the best [the adversary] could claim" because it would be directly against one's interest to do so.

Ms. Kanberg's second contention is somewhat stronger, although far from decisive. Ms. Kanberg's own statements show that Ms. Moradian's description to Ms. Kanberg of Lauder's intended use of "100%"—"the '100%' mark by itself on a line of 'ESTEE LAUDER' skin care products" (DX F, at 1566)—in the Court's view was accurate. It nevertheless is possible that Ms. Kanberg, having learned from Ms. Moradian's statement that Lauder intended to use "100%" standing alone and genuinely concluded that such a mark would be suggestive, later decided that the use of "100%" immediately above the words "Time Release Moisturizer" was materially different and descriptive.

The Court finds that Ms. Kanberg is sincere in her claim that she regards Lauder's actual use as descriptive by reason of the proximity of the words "Time Release Moisturizer" to "100%," although she of course is advocating her client's position. The characterization of the use, however, is for the Court and depends, as discussed below, on the likely public perception, not on Ms. Kanberg's or on the other self-serving characterizations offered by interested witnesses called by the parties.

panies that failed to resolve the dispute.[14] Neither party, it may be noted, fully disclosed its position to the other—Gap did not disclose its March 12 ITU applications, and Lauder did not inform Gap of an application to register "100% Time Release," an application it withdrew the day before it commenced this action.

### The Allegedly Conflicting Uses

#### Lauder's Product Launch

On April 16, 1996, Lauder launched its product on a preview basis at Macy's Herald Square and Bloomingdale's 59th Street in anticipation of a national launch on June 1, 1996. (PX 1, ¶ 11)

#### Packaging

The product is contained in a 1.7 fluid ounce dispenser which is packaged in a small, light blue box, the front and rear panels of which measure approximately 5⁵⁄₁₆ inches in height and 1¹⁵⁄₁₆ inches in width. The top of the front panel contains Estee Lauder's *EL* logo with the words ESTEE LAUDER printed immediately below the logo. Approximately 3¾ inches from the top of the panel appears the following text (PX 18):[15]

### 100%
Time Release
Moisturizer
with BioMineral Water

1.7 FL. OZ./50 mle

This presentation, it should be noted, is quite similar to packaging for a host of other Estee Lauder skin products, which the parties sometimes called the "blue line" in reference to their similar blue packaging. As PX 19–30 demonstrate, the marks under which these skin care products are sold—for exam-

ple, "Fruition" (PX 19)—all appear in the position comparable to "100%," also in a type face slightly bolder and larger than words beneath it which indicate the type of product—e.g., "triple reactivating complex" for Fruition—just as the words "time release moisturizer" appear beneath "100%."

#### Point-of-Sale Promotion

Lauder began shipping the product to retailers around the country between May 1 and May 7, and it was available in approximately 2,600 retail store locations by June 1. (PX 1, ¶ 15) Since that date, three point-of-sale items have appeared in those stores, an in-store screen (PX 3), a poster (PX 4), and a tester (PX 80). (PX 1, ¶ 16; Tr. 73)

The screen, which measures approximately three by two feet, depicts a bottle of product against a background of blue water on the left half and contains text on the right. The text, which is far more prominent than the lettering on the bottle of product, appears approximately as follows:

### Your skin will never feel thirsty again.

Estee Lauder invents
### 100%

Time Release Moisturizer
with BioMineral Water

The Estee Lauder house mark appears across the bottom of the right side of the screen in type approximately the same size as the phrase "Time Release Moisturizer." Thus, "100%" is by far the most prominent type on the screen.

---

**14.** Gap offers evidence of admissions allegedly made during those discussions in an effort to establish that Lauder "never ... objected to the use of 100% BODY CARE in every possible form." (DX DDDD ¶ 18; *see id.* ¶¶ 19–21) Lauder initially objected that whatever may have been said is inadmissible under FED.R.EVID. 408 because it was part of settlement negotiations as Ms. Moradian's letter indicated. It later withdrew that objection. The Court therefore has considered all of this evidence and finds that Lauder never indicated that it would acquiesce in any use by Gap in a trademark sense of "100%" or any variation thereof. It merely indicated that use of "100%" in an extremely insig-

nificant size and placement as part of a longer phrase, which would not have been regarded as a trademark use, would be an acceptable settlement. (Tr. 186–89; PX 87–89) Its willingness to do so has no material bearing on the issues in this case. Gap's estoppel defense (ans. ¶ 3), which appears to have been abandoned at trial, in any event is without merit.

**15.** Due to limitations of the Court's equipment, this is not an exact reproduction of the type styles and sizes used on the packaging. It is, however, sufficiently accurate to convey the material aspects of the appearance of the packaging.

The poster (PX 4) also features a bottle of the product against a blue water background with the Estee Lauder house set inside a gold stripe across the top. The bottle appears magnified several times its actual size and is tilted to the right, which leaves room for a large block of text on the top left half of the poster. The same text appears on the top left of the poster as is used on the screen, although the text is left, rather than center, justified and the layout is slightly different:

### Your skin will never feel thirsty again.

Estee Lauder invents

## 100%

Time Release
Moisturizer
with BioMineral Water

Once again, this text is the more prominent than the typeface on the bottle.

The tester (PX 80) displays a bottle of product, from which the prospective customer can try a sample, beside an illustration and text substantially the same as in PX 4, although the entire display is somewhat smaller in size.

*Advertising*

1. *Print Media.* Lauder began advertising the product in the June issues of national magazines such as *Allure, Vogue, Elle, Harper's Bazaar,* and *Self.* The advertisements (PX 5–9) are two page spreads.

The left page of each spread depicts a bottle of the product against a background of blue water but contains no text other than the bottle labeling. The most eye catching symbol on the bottle is the *EL* logo near the top, which contains letters in gold script against a black background surrounded with a square gold border. The words "Estee Lauder" appear immediately below the logo. Toward the bottom appears the following:

## 100%
Time Release
Moisturizer
with BioMineral
Water

While "100%" is in type slightly bolder and larger than the words beneath it, the size of the type is approximately the same as that used in the words "Estee Lauder" that appear below the logo.

The right page of each spread contains only text in black ink against a white background. The words "Estee Lauder" appear across the bottom of the page. The top contains the following:

### Your skin will never feel thirsty again.

Estee Lauder invents

## 100%

Time Release
Moisturizer
with BioMineral Water

Below this appears a paragraph of text in smaller print which refers, among other things, to the product being a "**100%** Aqua-Sphere ™ formula" and uses the phrase "**100%** Time Release Moisturizer," with "**100%**" appearing in bold faced type. (*See, e.g.,* DX JJJJ)

Lauder advertises this product in newspapers as well, placing some of the advertising itself and contributing, pursuant to a cooperative advertising program, to the cost of advertising placed by retailers that features Lauder products. (PX 13; Tr. 73–74)

2. *Broadcast Media.* Lauder has begun an extensive program of broadcast advertising. Its television commercial, which began airing on July 5 and will be broadcast at least 5,000 times by November 8 (PX 1, ¶ 21), opens with the line "Estee Lauder's remarkable new 100%," which is spoken as "100%" appears prominently across the screen, superimposed over a bottle of the product depicted against a background of blue water. The "100%" super then disappears, and the voice over then continues, "100% time release moisturizer." (PX 14) The radio commercial first states, "Discover 100%, Estee Lauder's new time release moisturizer." A moment later, it urges the listener to "discover 100% time release moisturizer." (PX 15) Thus, both commercials first use 100% standing alone to refer to the product and then follow with a reference to "100% time release moisturizer."[16]

16. When Lauder submitted a story board for a proposed commercial, NBC sought substantia-

*Distribution*

Lauder markets its products, including the one at issue here, through limited distribution channels that, in its view, complement the image of quality it cultivates. (DX RR, at 28) As a recent registration statement said, "[t]hese channels consist primarily of upscale department stores, specialty retailers, upscale perfumeries and pharmacies.... Retailers are selected based on (i) their location, upscale image, external appearance and internal fittings, (ii) the qualifications and expertise of their staff, (iii) the scale and nature of their retailing activities, (iv) the space dedicated to selling [Lauder's] products, and (v) the range and quality of cosmetic products sold." (*Id.*) Among the well-known chains through which it reaches the consumer are Bergdorf Goodman, Neiman Marcus, Nordstrom, Bloomingdale's, Lord & Taylor and Saks Fifth Avenue. (*Id.*)

As might be expected, market research conducted for Lauder indicates that its customers typically are upscale in income and education, married, work outside the home, and 30 to 50 years of age. (DX GG, at 0357, 0367) Perhaps contrary to expectations, the same marketing study concluded that Lauder customers for "treatment" products, which include moisturizers, use so-called "mass" brands as well as prestige brands like Lauder and regularly shop mass retailers as well as prestige outlets such as those through which Lauder distributes.[17] (*Id.* at 0386, 0390) Indeed, the marketing consultant who prepared the study recommended that Lauder adopt means to further differentiate itself from mass brands in order to defend its market position and to seek to gain share by providing "a compelling reason to use Estee Lauder instead of the mass brands with which [customers] are currently satisfied ..." (*Id.* at 0462–63).

*Old Navy's Plans*

Gap intends to introduce a line of body care products that will be sold exclusively in its Old Navy stores. The basic line includes shampoo, conditioner, bar soap, shower gel, liquid hand soap, bubble bath, body lotion and eau de toilette. Each of these products is to be associated with one of eight fragrance/color groups, each of which has a specific designation such as "Groovy Grapefruit" and "Red Delicious." (DX CCCC ¶ 17–22; ¶ 30; DX VV) Part of the line consists of products directed at young children.

*Packaging*

The Old Navy line will be sold in bottles or other appropriate containers that typically will be much larger than Lauder's product. The labeling on the bottles follows a common pattern. The top of the bottle will contain a descriptor of the product—for example, bubble bath—which will be in white lettering against the colored background of the bottle.[18] Beneath the descriptor in an oval will appear the designation, such as Groovy Grapefruit, also in white lettering. Beneath that will appear the "100% BODY CARE" phrase, which will be in black. The words "for kids" will appear below the words "BODY CARE" on the products directed at children. Below "BODY CARE" or, in the case of children's products, "for kids" will be the bottle volume.

tion for certain of the copy, including the phrase "100% Time Release Moisturizer with Bio Mineral Water." (DX V) Lauder's executive director of biological research provided a memorandum documenting the time release properties of the product and stating that "the liposomes, which compose the entire formula, create a 100% time release moisturizer." (DX BB at 1109) Gap asserts that NBC's request and Lauder's response show that consumers will understand, and that Lauder uses, "100%" as part of the descriptive phrase, "100% time release moisturizer," rather than standing alone as a trademark. Gap, however, ignores the fact that the commercial (PX 14) first uses "100%" standing alone. The line upon which Gap relies comes later in the copy. NBC's request for substantiation was prompted only by that later line and therefore is not as strong an indicator of whether "100%" alone is viewed as a source identifier as Gap suggests. Moreover, Gap's contention that "Lauder's *only* actual use of ["100%"] was as an adjective or an adverb" (Def. Trial Br. 23) (emphasis in original) is incorrect.

17. For example, of 97 subjects who had used Lauder moisturizers within the month preceding the survey interviews, 28 regularly had shopped mass outlets. (DX GG, at 0390)

18. The color actually is in the bottle contents rather than the bottle itself. This is not readily apparent to the viewer.

The phrase "100% BODY CARE," except for the percent sign, will be in type somewhat smaller than the descriptor of the product and will appear approximately as follows:

$$100\ \%$$
**BODY CARE**

The combination of the black lettering and the greatly disproportionate size of the percent sign makes the phrase "100% BODY CARE" the most prominent part of the product labeling.

### Point of Sale Promotion and Display

The 100% BODY CARE line will be displayed in kiosks (depicted in DX ZZ and SSS, albeit with an outdated version of the trademark [19]) located in Old Navy stores. (DX CCCC ¶ 21) Bottles of product will be displayed on shelves (e.g., DX SSS, at 494), and the prominence of the "100%" mark on each bottle will make it a noticeable feature of the displays (e.g., id. at 495) as will the use of the mark on signage above the displays (e.g., id. at 982–83, 989). While the kiosks will feature bright colors and, in some cases, large cutouts of various animal icons associated with children's fragrances that are part of the line (DX CCCC ¶ 21), customers drawn to the kiosks will be confronted with an array of signage and product labelling featuring the "100% BODY CARE" mark.

### Advertising

Gap's Old Navy stores advertise in newspapers, via postcard mailings and in one magazine.[20] There is considerable overlap between the newspapers in which it does so and those used by Lauder. (Tr. 73–74) The Old Navy direct mail pieces are sent to residents of postal zip codes in proximity to Old Navy stores. (Tr. 130) Sometimes residents of target zip codes who can be identified as having incomes at the upper and lower extremes of the income distribution are exclud-

ed from mailings, but Gap's Mr. Hashagen indicated that the data do not permit this to be done in all cases. (Id. 131). Indeed, the evidence does not convince the Court that consumers with incomes at the upper and lower ends of the spectrum are excluded to any material extent from the addressees of the mailings. Hence, the Court finds that there is a very substantial overlap in the persons exposed to the advertising of the two companies.

### Old Navy's Customers

Gap designed the "100% BODY CARE" line to appeal to families and family members of all ages. (DX CCCC ¶ 23) The products are exaggerated in scale and size. (Id.) While Gap claims that its target Old Navy consumer has a household income in the range of $30,000 to $70,000 per year, the reality is quite different. A study presented to Gap's board in 1995 showed that 37 percent of Old Navy customers have household incomes in excess of $70,000 and 12 percent in excess of $100,000 per year. (DX AAA, at 423)

### The Old Navy Product Launch

Gap intends to introduce the "100% BODY CARE" line on a test basis in twenty Old Navy stores beginning in late August or early September. Assuming the test is successful, it expects to roll out the product to approximately an additional thirty stores during the fall. Eventually, Gap plans to introduce the line in all Old Navy locations. (DX CCCC ¶ 25)

### This Action

Lauder commenced this action on June 4, 1996 and sought a temporary restraining order and a preliminary injunction. Given that Gap does not intend to roll out its "100% BODY CARE" line until August, there was no need for a temporary restraining order or a preliminary injunction provided a prompt trial could be held. Accordingly, the Court permitted expedited discovery, and the trial

---

19. The principal and perhaps only difference between the version of the mark in these exhibits and that now proposed to be used is that the horizontal line below "100%" and above "BODY CARE" has been eliminated.

20. Old Navy at present confines its magazine advertising to *New York*. Lauder also uses that publication. (PX 34A; Tr. 73)

**606**

on the merits was held on July 9 and 10, 1996. The trial included a view, which was conducted in the presence of counsel for both sides, of the Old Navy store located at 18th Street and Avenue of the Americas in Manhattan.

### Discussion

In order to prevail here, Lauder must establish that it has a protectible trademark and that Gap's proposed use would be likely to cause confusion as to source. *Yarmuth–Dion, Inc. v. D'ion Furs, Inc.,* 835 F.2d 990, 992–93 (2d Cir.1987).

### Protectibility of the Mark

■ In determining the protectibility of a putative mark, courts employ the classic typology articulated by Judge Friendly: putative marks are classified as (1) arbitrary or fanciful, (2) suggestive, (3) descriptive, and (4) generic. *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir. 1976). Arbitrary, fanciful and suggestive marks are inherently distinctive and thus subject to immediate protection upon commercial use. *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 768, 112 S.Ct. 2753, 2757, 120 L.Ed.2d 615 (1992); *Abercrombie,* 537 F.2d at 10–11. Descriptive marks are protected only if they are shown to have acquired secondary meaning to consumers. *E.g., Abercrombie,* 537 F.2d at 10. Generic terms, which "refer[ ] ... to the genus of which the particular product is a species," never are protected. *Id.* at 9.

### The Mark

We are met at the outset with a dispute as to what the mark is. Lauder asserts that its trademark is "100%" standing alone, while Gap contends that the mark is "100% Time Release Moisturizer." The controversy is rooted in the *Abercrombie* typology and Lauder's understandable concession that its product, only recently introduced, lacks secondary meaning.[21] Lauder's position is that "100%" is suggestive because it requires imagination to reach a conclusion as to the nature of its product. Gap, on the other hand, having essentially admitted that

"100%" standing alone is suggestive and therefore a protectible mark, contends that the mark is "100% Time Release Moisturizer." This phrase, it argues, is merely descriptive because it simply tells consumers that the package contains nothing but time release moisturizer and, given the absence of secondary meaning, is not protectible.

■ The problem thus presented is substantially identical to that dealt with by the PTO's mutilation doctrine. *See generally* 2 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 19.17 (3d ed. 1996) (hereinafter "MCCARTHY"). The PTO will reject registration of less than an applicant's entire mark on the theory that the applicant, by attempting to obtain protection of something less than its full trademark, seeks "to obtain protection for an element that is only his in combination with other words or symbols." *Id.* at 19–106.1. *See, e.g., In re Morganroth,* 208 U.S.P.Q. 284, 287–88 (T.T.A.B.1980); *In re Semans,* 193 U.S.P.Q. 727, 729 (T.T.A.B.1976).

■ In determining whether an applicant has "mutilated" the applicant's mark by seeking to register only a portion, both the Trademark Trial and Appeal Board ("TTAB") and the Court of Customs and Patent Appeals, the predecessor of the Federal Circuit, have looked to whether the matter sought to be registered creates a commercial impression separate from the larger context in which it is presented. *E.g., Barron–Gray Packing Co. v. Bruce's Juices, Inc.,* 162 F.2d 217, 218 (C.C.P.A.1947); *Morganroth,* 208 U.S.P.Q. at 287; *Textron, Inc. v. Cardinal Engineering Corp.,* 164 U.S.P.Q. 397, 399–400 (T.T.A.B.1969); 2 MCCARTHY § 19.17; *see also Institut National Des Appellations D'Origine v. Vintners International Co.,* 958 F.2d 1574, 1582–83 (Fed.Cir.1992). This of course makes eminent good sense, both in the registration context and in this case. The overall goal of trademark law is to protect the ability of consumers to distinguish among competing producers. *See, e.g., Two Pesos,* 505 U.S. at 771, 112 S.Ct. at 2759.

---

**21.** The Second Circuit has rejected the doctrine of secondary meaning in the making. *Laureys-* *sens v. Idea Group, Inc.,* 964 F.2d 131, 137–39 (2d Cir.1992).

Thus, as the parties agreed at trial (Tr. 20, 31), the relevant inquiry in determining whether the mark at issue here is "100%" or "100% Time Release Moisturizer" is whether a substantial number of consumers are likely to regard "100%," as Lauder uses it, as having independent commercial significance, *i.e.*, as identifying the source of the product.

■ Here, there is no direct evidence as to whether consumers in fact view "100%" as a source identifier. The product has not been in the market place long, and the parties have not offered market research, such as focus group studies, that shed light on the question. Gap, however, maintains that the record fairly compels a finding that "100%" is not and cannot be viewed by consumers as having independent commercial significance. It relies on three pieces of evidence. The first is an article about the product written by a *Women's Wear Daily* reporter, after an interview with Lauder personnel, in which the reporter referred to the product only as "time release moisturizer" or "100% time release moisturizer" and not as "100%." (DX X) The second is the request by National Broadcasting Co. for substantiation of what it took as a product claim made by the phrase "100% Time Release Moisturizer," which is said to evidence its understanding that "100%" was not a mark and that the longer term was descriptive. Note 16, *supra*. The third is the report of investigators engaged by Gap, which showed that few if any cosmetics sales personnel who were asked for "100%" in mid-June knew what the investigator was talking about. (DX EEEE; DX FFFF)

This evidence is not wholly without probative value, but the Court concludes that its significance is very limited. All of the events in question took place before the start of the extensive media campaign now underway in which Lauder prominently uses "100%" in a trademark sense in a context in which the viewer is likely to regard it as identifying the source of the product. NBC's reaction no doubt reflects in some part a desire on the part of the network to be certain that it airs nothing that possibly could be regarded as a product claim without seeking substantiation, even if the status of the language in question as a product claim is debatable. The investigators' activities are of dubious value for a number of reasons.[22]

On the other hand, there is substantial evidence supporting the view that consumers will regard "100%" as denoting the brand of the product. The point-of-sale posters, in-store screens, packaging and most of the print advertising use "100%" standing alone on a line and in bolder print than other copy on the items. The television commercial opens with the line, "Estee Lauder's remarkable new 100%," a usage in which "100%" stands alone.[23] The indication that 100% is being used as a brand on the packaging is enhanced by the similarity to Lauder's other blue line products, which have cultivated the expectation that the position on the packaging where the term "100%" appears is the product's brand name, and the following line or lines in smaller print the descriptor. The

22. Gap's private investigators were sent to a number of retail stores to ask for "100%" in an effort to show that the product in fact is not called or perceived by "100%." (DX EEEE ¶¶ 5, 9–15 & attached exhibit; DX FFFF ¶¶ 4–8 and attached exhibits). Most of the sales personnel, many of whom were not among those whose efforts are dedicated to the Lauder line (*see* Tr. 70–71, 284; DX EEEE at 1; DX FFFF at 1), seemed to be unaware of a product called "100%." These responses, however, are not of great significance. First, the methodology employed was so deficient that the results are entitled to little weight. *See generally Arche, Inc. v. Azaleia, U.S.A., Inc.*, 882 F.Supp. 334, 335–36 (S.D.N.Y.1995); 4 McCarthy § 32.46–32.50. To mention only one of the problems, the investigators knew who their client was and, in consequence, the desired outcome (DX EEEE ¶¶ 4, 9;

*see* DX FFFF ¶ 4)—a circumstance likely to produce a biased result despite the best of intentions. *E.g., Arche, Inc.*, 882 F.Supp. at 336. Second, the level of ignorance displayed by the sales people contacted is not surprising given that the product had been on the market for less than three weeks at the time of the contacts. Indeed, Lauder's training program for in-store sales personnel began on July 8, 1996 (Tr. 67, 70–71), well after the investigators concluded their activities. In all the circumstances, the Court finds that the reactions of the sales personnel are not particularly probative of whether consumers are likely to regard "100%" as a source identifier.

23. As noted, a subsequent line in the commercial uses the phrase "100% time release moisturizer."

prominence given to such stand-alone, as opposed to product-describing, uses of "100%" is somewhat less in the product labeling, certain cooperative print advertising, and the radio commercial. Nevertheless, in all the circumstances, the Court finds that "100%" has commercial significance independent of the phrase "time release moisturizer" in that it is likely to be perceived by consumers as designating the source of the product.[24]

### The Mark Is Suggestive

In view of Gap's admissions, both by seeking to register "100%" standing alone and in trial testimony (*e.g.*, Tr. 160; DX CCCC ¶ 12) that "100%" so used is suggestive and therefore protectible without proof of secondary meaning, the analysis of protectibility might stop at this point. Nonetheless, in view of Gap's insistence that Lauder does not use "100%" standing alone, the Court holds that "100%" as used by Lauder is suggestive, irrespective of whether that use is characterized as "standing alone."

Differentiation between suggestive and descriptive marks is not always easy. Nevertheless, Judge Weinfeld's definitions are quite helpful:

> "A term is suggestive if it requires imagination, thought and perception to reach a conclusion as to the nature of goods. A term is descriptive if it forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the goods." *Stix Products, Inc. v. United Merchants & Manufacturers Inc.*, 295 F.Supp. 479, 488 (S.D.N.Y.1968), *quoted in Abercrombie*, 537 F.2d at 11.

Helpful also is consideration of whether protection should be restricted to avoid precluding competitors from describing their products in an appropriate and necessary way. *Abercrombie*, 537 F.2d at 11; *see Qualitex Co. v. Jacobson Products Co.*, —— U.S. ——, ——, 115 S.Ct. 1300, 1304, 131 L.Ed.2d 248

(1995) (trade dress protection for functional product features limited to foster competition); *Fabrication Enterprises, Inc. v. Hygenic Corp.*, 64 F.3d 53, 57–59 (2d Cir.1995) (same).

■ Assuming that the Court has found correctly that Lauder's mark is "100%," the categorization on the *Abercrombie* spectrum is straightforward. The product here is a skin moisturizer. The designation "100%" has no particular meaning with respect to such a product and certainly does not convey specific product attributes. Indeed, Gap's own personal care products manager admitted at his deposition that "100% on its own is meaningless." (McNatton Dep. 71) Rather, "100%" suggests the idea of quality to consumers whose imaginations and thought processes are provoked. *See, e.g., Tanel Corp. v. Reebok International Ltd.*, 774 F.Supp. 49, 52 (D.Mass.1990) (mark "360°" suggestive of pivotability of sports shoes); *In re Ralston Purina Co.*, 191 U.S.P.Q. 237, 238 (T.T.A.B. 1976) ("SUPER" suggestive when used on slushy soft drink because term merely "connote[s] a vague desirable character or quality"). As Mr. McNatton of Gap put it, "100% *suggest[s]* that a product [is] the best, [is] all that a consumer could expect from such a product, and create[s] a positive association with 'giving it your all, or your 100%.'" (DX CCCC, ¶ 12) (emphasis added). Moreover, according trademark protection to "100%," used as Lauder uses it, will not impair the ability of competitors to describe their products. As is discussed in greater detail below, use of "100%" in purely descriptive phrases (such as "100% cotton" on a garment tag) is quite different from the manner in which Lauder uses the term and would be unlikely to cause confusion in any case. As "100%" is suggestive, the Court finds that Lauder's mark is inherently distinctive and therefore protectible without proof of secondary meaning.[25]

---

**24.** Gap conceded at trial that the manner in which the product is packaged, promoted and advertised is properly considered in determining whether "100%" is perceived as a brand name. (Tr. 249–50)

**25.** Notwithstanding its own effort to register "100%" and the testimony of its own witnesses, Gap has argued that "100%" is not protectible

because it is merely a laudatory term. (Def. Trial Br. 41 n. 9) There is, to be sure, a bald statement in a leading treatise to the effect that "[s]elf-laudatory or 'puffing' marks" are descriptive because they merely describe the character or quality of the goods. 1 McCarthy § 11.05[2][b], at 11–22; *but see id.* § 11.25[1][b], at 11–136 to 11–137. The case law, however, is

■ The result would be no different if the mark properly were viewed as "100% Time Release Moisturizer." As Gap acknowledged at trial, the phrase, particularly given the manner in which it is displayed in Lauder's labelling, packaging, advertising, and promotion, is susceptible of three interpretations: (1) this bottle contains nothing but time release moisturizer, (2) this product moisturizes 100% of the time, and (3) this is 100% (the brand) time release moisturizer. (Tr. 247) The third of these interpretations, Gap concedes, is suggestive. (*Id.*) In consequence, if the mark were viewed as "100% time release moisturizer," the issue would be whether a mark that consists of a double or triple entendre, at least one meaning of which is suggestive, is protectible without proof of secondary meaning.

As a general proposition, the answer to this question is affirmative. *See, e.g., Colonial Stores Inc.*, 394 F.2d 549, 552 (C.C.P.A. 1968) (SUGAR & SPICE for baked goods "more than a mere description of the ingredients of the goods" because it evoked associa-

tion with rhyme "everything nice"); *In re Grand Metropolitan Foodservice, Inc.*, 30 U.S.P.Q.2d 1974, 1975 (T.T.A.B.1994) ("MufFuns" as applied to muffins protectible because it "project[s] a dual meaning or suggestiveness—that of muffins and of the 'fun' aspect" of the product); *In re Priefert Manufacturing Co.*, 222 U.S.P.Q. 731 (T.T.A.B. 1984) (HAY DOLLY not merely descriptive for self-loading trailers for hauling bales); *In re National Tea Co.*, 144 U.S.P.Q. 286 (T.T.A.B.1965) (NO BONES ABOUT IT not merely descriptive of boneless ham).

The point is particularly well illustrated by *Institut National des Appellations d'Origine des Vins et Eaux-de-Vie v. Vintners International Co.*, Opp. No. 81,742 (T.T.A.B. Mar. 19, 1991), *aff'd without consideration of the point*, 958 F.2d 1574 (Fed.Cir.1992). In that case, the applicant sought to register "CHABLIS WITH A TWIST" for a citrus-flavored wine. The opposer sought to block registration on the ground, among others, that the mark was "merely descriptive" within the meaning of Section 2(e)(1) of the Trademark

far more complex and nuanced than this summary would suggest. Indeed, numerous cases have held that laudatory terms may be suggestive and protectible without proof of secondary meaning. *E.g., France Milling Co. v. Washburn–Crosby Co.*, 7 F.2d 304, 306 (2d Cir.1925) (GOLD MEDAL suggestive for flour); *Procter & Gamble Co. v. Johnson & Johnson Inc.*, 485 F.Supp. 1185, 1196 (S.D.N.Y.) (SURE suggestive for deodorant), *aff'd without opinion*, 636 F.2d 1203 (2d Cir.1980); *Avtex Fibers v. Gentex Corp.*, 223 U.S.P.Q. 625, 629–30 (T.T.A.B.1984) (PFR PLUS suggestive for permanently flame retardant fabric, a characteristic generically denoted by PFR); *In re Ralston Purina Co.*, 191 U.S.P.Q. 237 (T.T.A.B.1976) (SUPER suggestive for slushy soft drink).

Two considerations appear to guide the determination whether a laudatory mark is suggestive or descriptive. First is whether the mark baldly states the attribute of the product being lauded or, instead, requires some imagination or associational process to discern it, the latter being more suggestive. Second is the mark's meaning in the context of a particular product and third party uses of the term, with a more uncommon use supporting a finding of suggestiveness.

The first of these principles is well illustrated by the GOLD MEDAL case, *France Milling Co.*, and *Avtex*. In *France Milling Co.*, the Second Circuit affirmed a determination that GOLD MEDAL was "suggestive of merit" because it evokes the idea of an award of a prize, thus adverting to the consumer's need to engage in an associational

process to ascertain the laudatory meaning. 7 F.2d at 306. In *Avtex*, the TTAB relied upon the conclusion that PLUS meant simply an added quantity or quality beyond the usual without containing anything "to indicate with any degree of specificity just what this something more is." 223 U.S.P.Q. at 629.

The second principle is illustrated by decisions finding SUPER to be suggestive or descriptive, depending upon context. *Compare In re Ralston Purina Co.*, 191 U.S.P.Q. 237 (SUPER SLUSH suggestive for soft drink); *In re Occidental Petroleum Corp.*, 167 U.S.P.Q. 128 (T.T.A.B.1970) (SUPER IRON for soil supplements suggestive as implying that product contains larger amount or superior quality iron than in other products), *with Loctite Corp. v. National Starch and Chemical Corp.*, 516 F.Supp. 190, 203 (S.D.N.Y.1981) (SUPERGLUE descriptive because SUPER in that context had "passed into the public parlance" to signify the exceptionally strong adhesiveness of cyanoacrylate); *In re General Tire & Rubber Co.*, 194 U.S.P.Q. 491, 494 (T.T.A.B.1977) (SUPER STEEL RADIAL descriptive in view of significance to consumer of varying tire grades). While the fact that a term is laudatory does not preclude a conclusion that a mark is suggestive, it may bear on the strength of the mark and breadth of protection, especially if the term is used regularly to convey the same positive meaning for other products. *See France Milling Co.*, 7 F.2d at 305; *Procter & Gamble Co.*, 485 F.Supp. at 1196–97 & n. 4.

Act of 1946, as amended, 15 U.S.C. § 1052(e)(1) (1988), assuming that the product contained wine properly characterized as chablis. The opposer's premise was that the phrase "with a twist" simply denoted a beverage containing flavoring from a strip of citrus peel. The TTAB, however, rejected the opposer's contention. It found that the phrase "with a twist" was susceptible to the interpretation placed on it by the opposer, but could be construed also to suggest that the product had unspecified attributes that were "unusual, unexpected or unique." "[T]he double entendre created by this situation," it held, "removes this term from the category of merely descriptive words and shifts it clearly into the area of suggestive marks." Slip op. at 13.

Gap rejoins that the principle protecting suggestive double entendre applies only if the suggestive meaning would be apparent to the average prudent consumer which, it maintains, is not the case here. Inasmuch as the standard governing the existence of infringement is whether "an appreciable number of ordinarily prudent purchasers are likely to be misled, or . . . confused," [26] one well might question Gap's focus on the hypothetical "average" consumer as imposing an unduly stringent burden on the holder of the mark. But it is unnecessary to resolve that issue here, for this Court finds that the suggestive meaning here claimed by Lauder would be apparent to the average prudent consumer. Several factors contribute to this conclusion.

First, the suggestive construction of the phrase "100% time release moisturizer" is catchy and effective. The use of "100%" transforms an otherwise blandly descriptive phrase into something more distinctive and, at the same time, more likely to be viewed by consumers as a source identifier. Indeed, the Court finds that it is the suggestive quality of "100%," whether used alone or as part of "100% time release moisturizer" or "100% body care," that makes it sufficiently attractive to both parties to warrant their doing battle over it.

Second, there are substantial graphic and video cues in Lauder's use of "100%" that signal to consumers that "100%" does not simply modify the phrase "time release moisturizer." In the television and radio commercials, as previously described, "100%" plainly is used initially as a brand name and not in conjunction with "time release moisturizer." The visual portion of the television commercial strongly reinforces the brand name usage of "100%." The term "100%" appears on the product labelling on a separate line and in slightly larger and bolder type. The print advertising and promotional materials almost all use "100%" in type far larger than "time release moisturizer" and in layout that leaves little doubt that "100%" does not merely modify that phrase. The positioning and appearance of "100%" on the packaging is similar to that of the other product brand names in the blue line, thereby accentuating the likelihood that consumers will view "100%" as a brand.

Finally, it is important to recognize the commercial context in which Lauder's manner of using "100%" differs from other circumstances in which "100%" or some other percentage is used to modify a subsequent phrase in order to tell the consumer, quite directly, something about the content of a product. Examples of the latter abound: the fiber content of fabric (*e.g.*, "100% cotton," "100% wool," etc.) and the fat content of food (*e.g.*, "95% fat free"), to name only two. (*See* DX L for other examples.) In all or substantially all of these cases, the specific composition of the product with respect to the ingredient concerning which the percentage conveys information is important to consumers. In all or substantially all of these cases, comparable products offered by different sources vary in the percentage of the particular ingredient in question, and product content therefore is a significant competitive point. The percentage usually is communicated graphically in a manner that does not distinguish it from the characteristic it is describing. The consumer therefore is highly likely to construe the message as nothing

26. *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 256 (2d Cir.1987). *Accord, Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 390 (2d Cir.1995) ("numerous ordinary prudent consumers").

more or less than a description of the content of the product. For example, the prospective purchaser of a shirt, faced with a "100% cotton" label, is likely to conclude only that the fabric contains cotton alone. Similarly, the prospective purchaser of juice labelled "100% freshly squeezed orange juice" (DX KKKK) is likely to conclude only that there is no water or concentrate added to the product.

Two factors distinguish this case from such uses. First, there is no well known or apparent competition among sources of moisturizers with respect to the proportion of their formulations that consist of time release components. Hence, a consumer seeing even the phrase "100% time release moisturizer" would be hard pressed to derive a sensible, conventional descriptive meaning and more likely to regard "100%" in its suggestive sense. Second, the consumer is invited to go through that mental association process by Lauder's graphic and aural distinction between "100%" and "time release moisturizer."

Accordingly, this Court finds that the average prudent consumer would understand the phrase "100% time release moisturizer" in the suggestive sense referred to above. The mark therefore is protectible absent proof of secondary meaning.

*Likelihood of Confusion*

■■■ Likelihood of confusion is assessed with reference to the factors enunciated in *Polaroid Corp. v. Polarad Electronics Corp.,* 287 F.2d 492 (2d Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). The *Polaroid* factors, none of which alone is dispositive, include: (1) strength of plaintiff's mark; (2) similarity of the marks; (3) proximity of the goods or services (4) likelihood of bridging the gap; (5) quality of the products; (6) buyers' sophistication; (7) actual confusion; and (8) defendant's good or bad faith in adopting and using the mark.

*Strength of the Mark*

■■■ "The distinctiveness or 'strength' of a mark measures its capacity to indicate the source of the goods or services with which it is used." RESTATEMENT (THIRD) UNFAIR COMPETITION § 21, *cmt. i* (1995) ("RESTATEMENT"). It depends on two factors: (1) the inherent distinctiveness of the mark (*i.e.,* whether it is descriptive, suggestive, arbitrary or fanciful), and (2) the degree to which it is distinctive in the marketplace (*i.e.,* the degree to which consumers recognize the mark as identifying the source of the goods). *W.W.W. Pharmaceutical Co. v. Gillette Co.,* 984 F.2d 567, 572 (2d Cir.1993); *Mejia and Associates, Inc. v. IBM Corp.,* 920 F.Supp. 540, 546 (S.D.N.Y.1996); *see also* RESTATEMENT § 21, *cmt. i* (inherently distinctive marks tend to be stronger than descriptive marks, but "a descriptive mark through vigorous promotion can become a strong mark").

■■■ Lauder's "100%" mark stands alone on a line in type slightly larger and bolder than other print on the rest of the labelling and packaging. In such context, "100%" means nothing. Lauder gives "100%" special prominence in its advertising, where "100%" often is used unmistakably as a mark, as in the opening line of the television commercial, or in print so large in relation to the size of the words "time release moisturizer" as virtually to divorce the two. The vigor with which these parties are vying for the exclusive right to use "100%" circumstantially supports the view that "100%" is distinctive, especially since Gap seeks to use it with the generic phrase "body care."

The Court has considered the factors undercutting the contention that Lauder's use of "100%" is strongly distinctive. The treatment of the product in the *Women's Wear Daily* article and NBC's action, although insufficient to warrant the conclusion that the mark is merely descriptive, bear on the degree of its distinctiveness. The same is true of the proximity of "100%" to "time release moisturizer" and the possibility that the proximity would contribute to a purely descriptive reading. The fact that the product is new to the market limits an aspect of the mark's strength, *see C.L.A.S.S. Promotions v. D.S. Magazines, Inc.,* 753 F.2d 14, 17–18 (2d Cir.1985), as does Lauder's concomitant acknowledgment that the mark today lacks

secondary meaning.[27] The nature and extent of advertising and promotion already deployed somewhat offsets this limitation, and, in any event, a "lack of secondary meaning does not preclude a court from finding that an otherwise distinctive mark is strong." *W.W.W. Pharmaceutical Co.*, 984 F.2d at 573; *cf. Two Pesos, Inc.*, 505 U.S. at 775–76, 112 S.Ct. at 2760–61 (inherently distinctive trade dress protectible from inception).

The Court has considered as well the evidence of third party trademark registrations, trademark uses, and other uses of "100%."[28] (DX QQQ; DX L; PX 68–70; DX E) The bulk of this evidence simply illustrates that "100%," used conventionally, as in "100% cotton" or "100% oil-free," denotes content or ingredients of a product. For reasons explained already, the Court finds that Lauder's use is quite different, and the conventional uses of "100%" therefore do not detract significantly from the inherent distinctiveness of Lauder's mark.

There are a handful of uses of "100%" standing alone as a trademark for products completely unrelated to Lauder's, such as for motorcycle accessories, real estate newsletters, computer disks, clothing, and youth magazines. (PX 68–75; DX QQQ) The Court finds that these uses of "100%" show that plaintiff's suggestive and laudatory use of the term —to mean that the product is the best or superior—is not wholly original. Nevertheless, because those similar uses are relatively few in number and for unrelated products, and because Lauder's claim here is directed against a similar use for closely related products, the strength of plaintiff's

mark in the context of personal care products is not diminished significantly.

The only significant use of "100%" for a product related to Lauder's is "ONE HUNDRED % BIJAN!" for perfume or cologne. (DX E) The Court finds, however, that the predominant impression conveyed by Bijan's use of the term is that the product is "pure BIJAN," where Bijan stands for the luxury associated with a pricey, high-class retailer that began on Rodeo Drive. (Tr. 81) The terms "ONE HUNDRED," "%" and "BIJAN" are of equal sized type and meant to be read together. Thus, the Court finds that BIJAN uses 100% differently and its impact on the strength of Lauder's mark for personal care products is marginal.

Taking all of these factors together, the Court finds that Lauder's mark is of moderate strength, standing neither at the weakest nor the strongest end of the suggestive range. *Cf. Procter & Gamble Co.*, 485 F.Supp. at 1196.

*Similarity of the Marks*

■ The second of the *Polaroid* factors— the similarity of the marks—is judged by "consider[ing] all factors that could reasonably be expected to be perceived and remembered by potential customers" including "the context in which the respective marks are generally presented." *Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 394 (2d Cir. 1995) (internal quotation marks omitted). The common use of an identical word or symbol is not alone sufficient to establish confusing similarity. *Mejia and Associates,*

---

27. Ordinarily, evidence relevant to the determination of secondary meaning bears also on the strength of a mark. *McGregor–Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1132 (2d Cir.1979); RESTATEMENT § 21, *cmt. i*. The Second Circuit's rejection of the doctrine of secondary meaning in the making in *Laureyssens*, 964 F.2d at 137–39, precludes reliance on nascent secondary meaning in determining whether a mark is protectible, but the opinion did not address the implications of future advertising and promotion for assessing the strength of the mark. Where a mark is inherently distinctive, concrete evidence of imminent use and exposure of the mark seems an appropriate consideration in assessing strength. Nevertheless, the Court's finding that plaintiff's mark is moderately strong does not rely on any evidence of future advertising and promotion.

Against the possibility that there may be an appeal in this case, and in order to avoid any necessity for a remand, the Court finds that consideration of Lauder's existing advertising and promotion plans would bolster the Court's finding as to the strength of the mark and would move it further along the spectrum.

28. The existence of third party uses, as Gap urges, is relevant to the strength of a mark. *E.g., W.W.W. Pharmaceutical Co.*, 984 F.2d at 573; *Western Pub. Co. v. Rose Art Indus., Inc.*, 910 F.2d 57, 61 (2d Cir.1990); *Plus Products v. Plus Discount Foods, Inc.*, 722 F.2d 999, 1005–06 (2d Cir.1983). *See also* note 25 *supra* (other uses of laudatory term bear on strength of mark and breadth of protection).

*Inc.*, 920 F.Supp. at 547. Rather, the key inquiry is whether the overall *impression* of an alleged infringer's mark is confusingly similar to the plaintiff's mark. *McGregor-Doniger, Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1134 (2d Cir.1979); *Mejia and Associates, Inc.*, 920 F.Supp. at 547; *Bear U.S.A., Inc. v. A.J. Sheepskin & Leather Outerwear, Inc.*, 909 F.Supp. 896, 905 (S.D.N.Y.1995). Sound, sight and meaning are touchstones for this analysis. 3 MCCARTHY § 23.04.

▬ The dominant impression created by both parties is an association of "100%" with a product or products used in caring for the body. Both seek to convey (DX CCCC ¶12; PX 1, ¶8) and, the Court finds, will succeed in conveying by that association the notion that theirs are superior personal care products. Thus, the connotation of the two marks is identical.

The visual impression created by the marks is somewhat different. The typography and layout differs, as does the packaging. However, Gap's use of large black lettering for "100% BODY CARE" makes that phrase the most prominent graphic element of its products. The use of the oversized percentage sign reinforces and exaggerates the tendency to focus on "100%" by drawing the eye immediately to that part of the package. Lauder achieves a similar result by the prominence of its brand-name usage of "100%" in its broadcast advertising and the disproportionate size of "100%" in its point-of-sale and print advertising materials. In consequence, the overall visual impression conveyed by both parties is centered on "100%."

As in all cases that do not involve direct counterfeiting, there are other facts that point away from a conclusion of similarity. Lauder, for example, uses its house marks in a quite noticeable way in connection with this product, as with all of its products.[29] Nevertheless, the Court finds that the prominent use of "100%" by both parties—particularly in view of the fact that each of the parties uses "100%" to convey the same idea in conjunction with closely related personal care

products—makes the similarity factor weigh in Lauder's favor.

*Proximity of the Products*

▬ Gap argues most strenuously that its "100% BODY CARE" line is competitively distant from Lauder's product and, in consequence, that this factor weighs strongly in Gap's favor. *See Arrow Fastener*, 59 F.3d at 396 ("This factor is concerned with the competitive distance between the products."). It contends that the products are quite different, that they are sold in different outlets and in different retailing environments, and that they are sold to different types of customers.

Gap has focused on relevant factors. The proximity prong of the *Polaroid* test looks to "the nature of the products themselves and the structure of the relevant market." *Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 480 (2d Cir.1996) (internal quotation omitted). Relevant considerations include the class of customers to whom the goods are sold, the manner of advertising, the channels through which the goods are sold, and the extent to which the goods or services fall within the same class or are used together. *Id.; Mejia and Associates, Inc.*, 920 F.Supp. at 547–48. Gap's argument, moreover, has significant support in the record, although not as much as Gap would have it.

*1. The Products.* Lauder's product is a high technology facial moisturizer sold in tiny elegant bottles containing 1.7 fluid ounces of product. Its suggested retail price is $32.50 per bottle. Gap's line includes a body lotion as well as other personal care products. It typically will be sold in much larger bottles at much lower prices. A consumer who had made an informed decision to buy either product would be unlikely to purchase the other by mistake. But that is not the end of the analysis.

These products all are used for personal care, a point emphasized by Gap's "100% BODY CARE" designation. They are closely related in the sense that it takes no leap of faith for a consumer to believe that an entity that produces a time release moisturizer

---

29. While the Old Navy name appears on its products, it ordinarily is on the opposite side of the package from the "100% BODY DESIGN" mark and therefore not readily visible.

called "100%" has something to do with a body lotion or other personal care product sold under a name prominently featuring "100%." *See, e.g., Johnson & Johnson v. Diaz,* 339 F.Supp. 60, 64 (C.D.Cal.1971) (cologne closely related to line of cosmetics and toiletries); *Johnson Publishing Co. v. International Development, Ltd.,* 221 U.S.P.Q. 155, 156 (T.T.A.B.1982) (hair care products related to cosmetics); *In re Natural Enterprises, Inc.,* 183 U.S.P.Q. 572 (T.T.A.B.1974) (moisturizing lotion related to hair shampoo).

2. *Channels of Distribution.* The difference between the Lauder and Gap products is nowhere greater than with respect to the channels through which they are distributed. Gap's products will be sold only in Gap's Old Navy stores which, with rare exceptions, sell nothing other than merchandise sold under the Old Navy name. Lauder, as noted, sells only through prestige retail stores—upscale department stores and the like. Moreover, the difference in the ambiance between the stores that handle Lauder's product and Old Navy stores is quite dramatic. Whereas Lauder limits distribution to outlets offering upscale images with a quite polished ambiance, Old Navy pursues a very different look and feel. Its stores feature merchandise displayed on industrial shelving and in other imaginative ways that best may be described as funky.[30] Loud modern rock music is played. The floors are uncarpeted. Sales personnel dress informally, and many in the New York store wear headsets. No one knowledgeable about the sort of places in which Lauder sells its upscale products would be likely to think that the very same products would be available in an Old Navy store. Once again, however, this is not the whole story. Not all customers are knowledgeable, and even knowledgeable customers could be misled into thinking that Lauder is associated with the "100% BODY CARE"

products, either as producer or licensor of an off-price line. Hence, where goods are closely related, as here, confusion may be "likely even though [the goods] are distributed to different customers through mutually exclusive channels of trade." 3A RUDOLF CALLMAN, THE LAW OF UNFAIR COMPETITION, TRADEMARKS & MONOPOLIES § 20.54, at 20–436 (4th ed. 1983). *See also Home Shopping Club, Inc. v. Charles of the Ritz Group, Inc.,* 820 F.Supp. 763, 772–73 (S.D.N.Y.1993).[31]

3. *Class of Customers.* Gap argues that the target customers for these products do not overlap. That, however, blinks reality. The evidence showed, and the Court finds, that the income and age distribution of the customers who actually buy Old Navy products is not substantially different from those of the customers who use Lauder's skin treatment products. Moreover, the Court is persuaded that there is very substantial cross-shopping—that is to say, that consumers who shop upscale department and specialty stores also frequent stores such as Old Navy and *vice versa.* (*E.g.,* McNatton Dep. 169–70 (consumer shops everywhere)). In consequence, the suggestion that Lauder's customers will not be exposed to the Old Navy products and *vice versa* simply is untenable.

The facts pertinent to assessment of the products' proximity thus cut in different directions. Weighing most heavily in Lauder's favor is the close relationship between the products. Gap, on the other hand, is most helped by the substantial disparity in the appearance and ambiance of the retail outlets through which the products are sold, which may mitigate point of sale confusion. Taking all of the relevant considerations together, the Court finds that the products stand in sufficiently close proximity to create some likelihood that consumers will be confused or misled as to the existence of some affiliation

---

**30.** For example, in the store viewed by the Court, some wearing apparel was shrink-wrapped on small styrofoam trays which were displayed in a case such as those frequently used in supermarkets to display meat or dairy products, although the wearing apparel of course was not refrigerated.

**31.** Moreover, courts in this district have held that distinct channels of trade is a factor having little

or no bearing on post-sale, as opposed to point of sale, confusion. *Reebok Int'l Ltd. v. K–Mart Corp.,* 849 F.Supp. 252, 272 (S.D.N.Y.), *vacated by consent,* 33 U.S.P.Q.2d 1863, 1994 WL 733616 (S.D.N.Y.1994); *T. Anthony Ltd. v. Malletier,* 30 U.S.P.Q.2d 1214, 1217, 1993 WL 659682 (S.D.N.Y.1993); *see generally* 3A RUDOLF CALLMAN, THE LAW OF UNFAIR COMPETITION, TRADEMARKS AND MONOPOLIES § 20.54, at 192 (1996 Supp.).

or sponsorship by Lauder of the "100% BODY CARE" line.

### Bridging the Gap

"This factor takes into account the likelihood of the plaintiff expanding its product into the defendant's market." *Giorgio Beverly Hills v. Revlon Consumer Products,* 869 F.Supp. 176, 184 (S.D.N.Y.1994); *accord, W.W.W. Pharmaceutical,* 984 F.2d at 574. Here, of course, the parties already are in the same market in the sense that they sell, or will sell, closely related products to largely overlapping groups of consumers, although their products will not be sold through the same types of retail outlets.

Lauder has no plans to enter the retail mass middle market or to lower its prices substantially. Indeed, doing so would be inconsistent with its fundamental business strategy. (*See* Osborne Dep. 247–48, 253–54). Similarly, there is no evidence that Gap intends to distribute the "100% BODY CARE" line through retail outlets comparable to those used by Lauder. In consequence, this factor weighs in favor of Gap, although the significance of that fact is limited in view of the extent to which the parties already are in the same market.

### Actual Confusion

There is no evidence of actual confusion, which is not surprising. In view of the fact that Gap has not yet introduced its products, which means that there has been no opportunity to date on which actual confusion might have occurred, this factor is neutral.

### Gap's Good Faith or Bad Faith

■ "This factor concerns 'whether the defendant adopted his mark with the intention of capitalizing on [the] plaintiff's reputation and goodwill and any confusion between his and the senior user's product.'" *Cadbury Beverages, Inc.,* 73 F.3d at 482–83 (citations omitted) (alteration in original); *see also Bear U.S.A.,* 909 F.Supp. at 906–07. Indeed, a defendant's bad faith may be extremely important in assessing likelihood of confusion because one who sets out to trade on the goodwill of another ordinarily will be presumed to have accomplished that goal. *See Mobil Oil Corp.,* 818 F.2d at 258.

Lauder faces great difficulty in satisfying the established meaning of bad faith for purposes of this *Polaroid* factor. Lauder's product, new on the market as it is, concededly lacks secondary meaning. Hence, Gap cannot possibly have exploited Lauder's goodwill in the mark. Moreover, Lauder concedes that the Gap originally developed its 100% mark independently and in good faith. Nevertheless, Lauder maintains that Gap became a bad faith infringer once it learned from Dana that there was "a high end cosmetics company" on the "road to production" with a "100%" mark and, after learning of Lauder's ITU application, pressed forward with its own plans in the face of Lauder's protest and, indeed, this lawsuit. (Pl. Trial Br. 32–33) The Court does not accept this refashioning of the good faith—bad faith distinction.

As Professor McCarthy has written, "The only kind of intent that is relevant to the issue of likelihood of confusion is the intent to confuse." 3 MCCARTHY § 23.32[1], at 201. There simply is no basis for Lauder's assertion that Gap acted in bad faith simply because it did not fold its tent when it found Lauder's ITU application or, for that matter, when Lauder brought this action. As the Court has found, Ms. Kanberg, an experienced trademark lawyer, thought that Lauder's mark, as Lauder intended to use it, was not protectible. She advised her client accordingly. And while the Court ultimately disagreed with her, it is far from willing to say that her view and advice were so lacking in merit that they evidence bad faith in the legally relevant sense. *See id.* § 23.33[5], at 214 (need "very clear and legally unambiguous infringement" for a defendant's continued use to be construed as intent to deceive); *cf. Sweats Fashions, Inc. v. Pannill Knitting Co.,* 833 F.2d 1560, 1565 (Fed.Cir.1987) (bad faith requires "more than mere knowledge of prior similar mark"); *Parenting Unlimited, Inc. v. Columbia Pictures Television, Inc.,* 743 F.Supp. 221, 230 (S.D.N.Y.1990) (proceeding with knowledge of potential problem with mark does not necessarily establish bad faith); *Mushroom Makers, Inc. v. R.G. Barry Corp.,* 441 F.Supp. 1220 (S.D.N.Y.1977), *aff'd,* 580 F.2d 44, 48 (2d Cir.1978), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1022, 59

L.Ed.2d 75 (1979) (not bad faith to proceed in the belief that no conflict exists, even after PTO refused registration in view of plaintiff's mark). While Ms. Kanberg and her client were quite aggressive, they were aggressive in circumstances in which they had a colorable position and, moreover, in which Lauder through most of the relevant period had not begun using its mark in commerce.

Lauder places heavy reliance on *International Star Class Yacht Racing Association v. Tommy Hilfiger, U.S.A., Inc.,* 80 F.3d 749 (2d Cir.1996), in support of its bad faith argument. The Court of Appeals there held that the district court had relied upon two erroneous findings of fact and had failed to consider evidence of defendant's conduct after the initiation of the suit in determining that the defendant acted in good faith. To the extent the case holds that conduct after the adoption of the allegedly infringing mark is relevant in determining the defendant's *bona fides,* this Court applies it. Beyond that, the case is quite different from this one. The decision turned, first, on the fact that the defendant ignored the advice of its counsel to conduct a more thorough trademark search despite the fact that it knew it was copying "authentic details ... from the sport of competitive sailing." *Id.* at 753 (internal quotation marks omitted). Its actions reminded the Court of Appeals "two of the famous trio of monkeys who, by covering their eyes and ears, neither saw nor heard any evil." *Id.* at 754. The second pivotal point was the fact that the defendant in *Hilfiger* continued to infringe even after being sued and confirming the existence of the plaintiff's senior position.

Here, in contrast, Gap did not set out to copy anything and it proceeded on the advice of experienced counsel, advice that was not patently unreasonable, once the potential conflict emerged. The Court therefore finds that Gap acted in good faith. This factor therefore weighs in favor of Gap.

*Quality of Defendant's Product*

■ No one here disputes that Gap's products will be of good quality, just as no one disputes that Lauder's product is formulated quite differently from Gap's body lotion, the product bearing closest competitive relationship to Lauder's. Lauder is careful to distinguish all simple oil-water based emulsion moisturizers such as Gap's Old Navy product from its own patented formulation. (DX GGGG [32] ¶ 16; DX BB) The claims it makes of continuous, long-term benefits go well beyond Old Navy's claim that its product "leave[s] skin feeling soft and smooth" (DX GGGG, ¶ 17), which suggests that one using a Gap Old Navy product might well be disappointed if the user believed that it was made, sponsored by, or produced under license from Lauder.

The quality factor of the *Polaroid* test "considers whether the senior user's reputation could be 'tarnished by [the] inferior merchandise of the junior user.'" *Cadbury Beverages, Inc.,* 73 F.3d at 483 (citation omitted and alteration in original). *Accord, Mejia and Associates, Inc.,* 920 F.Supp. at 549. In these circumstances, the Court finds that there is a genuine risk that consumers who purchase the Gap product in the belief that it is associated in some way with Lauder will be disappointed and that the disappointment will rub off on Lauder. Accordingly, the factor cuts in Lauder's direction, although the Court believes that the extent to which it does so is limited.

■ Having evaluated the *Polaroid* factors, the Court is left with the task of determining whether the evidence supports a finding that an appreciable number of ordinarily prudent purchasers are likely to be confused. It is appropriate, therefore, to pause on two questions: (1) confused about what, and (2) what is an "appreciable number."

The Lanham Act makes clear that types of confusion which may give rise to infringement liability include confusion as to "affiliation, connection, or association" or "sponsorship." 15 U.S.C. § 1125(a)(1)(A) (West Supp. 1996). *Accord, e.g., Sterling Drug, Inc. v. Bayer AG,* 14 F.3d 733, 740–41 (2d Cir.1994); *Home Box Office, Inc. v. Showtime/The Mov-*

---

**32.** DX GGGG is the direct testimony of Robin Forbes, senior director for personal care product

development for all Gap divisions.

*ie Channel, Inc.*, 832 F.2d 1311, 1314 (2d Cir.1987). Thus, in order to prevail in this case, Lauder need not prove that consumers are likely to purchase Gap's products in the belief that they are buying Lauder's "100%" product or *vice versa*. It need only prove a likelihood that consumers will believe that Gap's "100% BODY CARE" line is somehow connected with the source of Lauder's "100%" product. For example, a likelihood that consumers will believe that the "100% BODY CARE" line is an off-price, mass market product of the same entity that produces Lauder's "100%" product would suffice.

▇▇▇ The law is clear also that plaintiff need not establish that all or even most consumers are likely thus to be confused. Plaintiff need prove only a likelihood that an appreciable number of ordinarily prudent consumers will be confused. *E.g., Mobil Oil Co.*, 818 F.2d at 256; 4 McCARTHY §§ 32.54[1][b][i], 32.54[1][c].

Here, Lauder has adopted a mark of middling strength (which is likely to become stronger). The prominence given "100%" by both companies, although in ways that are graphically somewhat different, renders the marks sufficiently similar to cause significant concern. The products stand in close proximity to one another.[33] Lauder is at risk that consumers encountering Gap's products will associate their quite different properties with the source of Lauder's products to Lauder's detriment. While the other *Polaroid* factors either are neutral or cut in Gap's favor, the Court finds in all the circumstances that an appreciable number of ordinarily prudent consumers are likely to be confused as to the sponsorship, affiliation or connection of the source of Lauder's "100%" product with Gap's "100% BODY CARE."

The likelihood of confusion is pronounced in, but not limited to, the post-sale context, in which a consumer may see the Gap product outside the retail setting, wrongly associate the product with Lauder's, and be influenced by the association in a later purchasing decision. *See* note 31 *supra; see generally Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 872–73 (2d Cir.1986) (describing post sale confusion). Moreover, the Court takes note of the long established principle that cases closely balanced as to likelihood of confusion should be resolved in favor of the senior user,[34] although this Court would reach the same result without regard to that rule.

*Conclusion*

▇▇▇ The Court is mindful of the fact that Gap will be forced, as a result of this decision, to destroy or change packaging materials already produced, change its mark and, perhaps, delay somewhat its new product introduction. The fact that the case is a close one perhaps makes that difficult to accept. Nevertheless, Gap knew that Lauder was on the "road to production" of a new product called "100%" as early as February 1996. At that time, it could have changed its plans with little or no disruption. It nevertheless decided to proceed. While it acted on the advice of counsel and had a colorable position, it nonetheless decided to take precisely the gamble that it now has lost. It must bear the consequences of its decision.

Accordingly:

1. Defendant, GPS (Delaware), Inc., the officers, agents, servants, employees, and attorneys of each of them, and all persons in active participation with any of them who receive actual notice of this order, be and

---

33. The proximity is not uniform across the "100% BODY CARE" line. Gap's body lotion stands in very close proximity to Lauder's moisturizer. Sponges and tooth brushes are far less proximate, although they still are related as personal care products. Nothing need be made of these differences, however, as the parties have argued the case on an all-or-nothing basis, which is entirely understandable in view of Gap's intention to use "100% BODY CARE" as a mark unifying its entire line.

34. *See, e.g., Giant Food Inc. v. Nation's Foodservice, Inc.*, 710 F.2d 1565, 1571 (Fed.Cir.1983);

*Glenwood Laboratories, Inc. v. American Home Products*, 455 F.2d 1384, 1387 (C.C.P.A.1972) (Rao, J., concurring) (collecting cases); *Geigy Chemical Corp. v. Atlas Chemical Indus., Inc.*, 438 F.2d 1005, 1008 (C.C.P.A.1971); *In re White Swan Ltd.*, 8 U.S.P.Q.2d 1534, 1536 (T.T.A.B. 1988); *see also Harold F. Ritchie, Inc. v. Chesebrough–Pond's, Inc.*, 281 F.2d 755, 758 (2d Cir. 1960) (second comer has a duty to avoid all likelihood of consumer confusion in product's name and dress).

they hereby are permanently enjoined and restrained from:

(a) Using the term "100%" as a trademark—whether alone or in combination with other terms or designations (including, without limitation, as part of the mark "100% BODY CARE" or any other of their "100%" marks)—on or in connection with the manufacture, advertisement, promotion, distribution or sale of any skin care, fragrance, cosmetic, hair care, toiletry and/or other personal care product; and

(b) Committing any other acts calculated or likely to cause confusion or mistake in the minds of the trade or public or to deceive prospective purchasers about the source or sponsorship of the parties' goods.

2. Defendant's counterclaim is dismissed.[35]

3. Plaintiff shall recover of defendant the costs of this action.

The foregoing constitute the Court's findings of fact and conclusions of law. FED. R.CIV.P. 52(a).

SO ORDERED.

---

**35.** Defendant counterclaimed for declaratory and injunctive relief. The claim is completely mooted by the determination with respect to the complaint.