**CHUM LIMITED, Plaintiff,**

v.

**Adam LISOWSKI et al., Defendant.**

**No. 98 Civ. 5060(CBM).**

United States District Court,
S.D. New York.

April 18, 2002.

Kenneth A. Plevan, Bruce J. Goldner, Steven M. Rosenthal, Skadden, Arps,

Slate, Meagher & Flom, LLP, New York City, for plaintiff.

Raymond J. Dowd, New York City, Jason E. Bogli, Dowd & Marotta, LLC, Brooklyn, NY, for defendants.

## OPINION

MOTLEY, District Judge.

Plaintiff Chum Limited ("Chum") uses "Fashion Television" and other similar marks in connection with its weekly television program featuring stories related to fashion. Defendant Adam Lisowski ("Lisowski") together with certain companies he owns and controls (collectively "defendants") use "Fashion TV" and other similar marks in connection with their 24–hour cable television channel devoted to fashion. Chum brought this action for injunctive relief, alleging trademark infringement, dilution, and unfair competition under the Lanham Act and the common law.

In March 2001 Judge Wood (to whom this case was then assigned) granted defendants partial summary judgment, dismissing Chum's trademark infringement and dilution claims based upon her finding that Chum's "Fashion Television" marks are generic. *See Chum Ltd. v. Lisowski*, 2001 WL 243541 (S.D.N.Y. Mar.12, 2001). However, Judge Wood denied summary judgment with respect to Chum's unfair competition claims. *See id.* at *9–*12.

Chum's unfair competition claims were tried before this court at a bench trial held from December 3 to December 10, 2001. Having reviewed all of the testimony and the exhibits received into evidence, the court hereby sets forth its findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). As discussed more fully below, the court holds that Chum failed to meet its burden of demonstrating either that its marks have acquired secondary meaning or that there is sufficient likelihood of consumer confusion.

Accordingly, the court enters judgment in favor of defendants.

## BACKGROUND

Chum, a Canadian corporation headquartered in Toronto, is a large international media company that produces both television programs and entire television channels containing a wide variety of content, such as news, performing arts, and science fiction. PX–25; Martin Tr. 32:1–33:13.

Chum began its foray into fashion programming in 1985 by launching "FT–Fashion Television," a thirty-minute weekly magazine program. PX–10; Martin Tr. 37:3–40:1. Each episode of this show is comprised of four to five distinct segments, such as interviews with designers or photographers, reports on recent events involving celebrities, or other pieces touching upon such topics as fashion, art, and architecture. Martin Tr. 37:16–24. Jeanne Beker has been the host of the show since its debut. PX–43; Martin Tr. 45:24–46:4. Chum typically produces thirty-nine regular half-hour episodes and one full-hour special episode of "FT–Fashion Television" each year. Martin Tr. 37:3–8.

Chum's program initially ran only in Canada, where it was very popular and won numerous awards. Martin Tr. 47:18–21. The program first aired in the United States in 1991 and, after debuting in Los Angeles, the VH–1 cable television network licensed it and broadcast it nationally from 1992 until 1999. Martin Tr. 48:14–17. VH–1 dropped the show in 1999, and since that time it has been broadcast nationally on the E! and Style cable television networks. Martin Tr. 57:20–58:3.

Chum initially called its program "FTV" but soon changed the name to "Fashion Television," in part because it learned that there already was a show using the name

"FTV" (as an abbreviation for "Fun TV"). Martin Tr. 41:3–17. Chum soon settled on the program's current name—"FT-Fashion Television"—although people (including Chum employees, members of the media, advertisers, members of the viewing public, etc.) often refer to the program unofficially as "Fashion Television," "Fashion TV," or "FTV" (collectively Chum's " 'Fashion Television' marks"). PX–23; PX–32; PX–52; Tapp Tr. 256:3–22; Helmrich Tr. 383:21–25; Martin Tr. 43:3–18. At some point during the early 1990s Chum also added to the show's name the subtitle "The Original. The Best."—thus rendering the full name of the show "FT–Fashion Television. The Original. The Best." Martin Tr. 42:24–43:2; 44:21–45:14.

Defendant Lisowski (who is also known as Michel Adam) is a Polish citizen residing in Paris. Defendant Fashion TV Paris, S.A.R.L. ("Fashion TV Paris") is a French limited liability company headquartered in Paris. Defendant F.TV, Ltd., a British Virgin Islands holding company, owns Fashion TV Paris. Lisowski is the Managing Director and sole officer of Fashion TV Paris and F.TV, Ltd. PX–113; Lisowski Dep. 40:3–42:19, 45:5–10.

In May 1997 defendants launched a 24–hour fashion television channel in France called "F.TV." PX–132; PX–135. The programming aired on defendants' channel is quite different from Chum's program. Whereas "FT–Fashion Television" is a magazine-style show consisting almost entirely of interviews and other types of actual reporting, defendants' programming consists exclusively of three to five minute clips from fashion shows in which models walk down runways displaying their designer clothing. These continuous runway clips are set to music and contain no dialog whatsoever, nor are they accompanied by interviews or any other type of actual reporting. PX–77; PX–136; Lisowski Dep.

49:14–50:5. Several witnesses likened this format to "video wallpaper." Helmrich Tr. 433:16–18; Rosenberger Tr. 706:18–21.

Defendants' channel was introduced in the United States in 1998. PX–90 at P01080; PX–100 at P01669; Lisowski Dep. 54:2–22. From May through December of that year, Time Warner Cable carried half-hour and full-hour segments of defendants' fashion programming on channel 35 in Manhattan under the names "Fashion TV" and "F. L'Original." Lisowski Dep. 55:18–20. Since the summer of 1998, defendants' channel has aired 24 hours a day on Charter Cable's channel 68 in Miami. PX–77; Lisowski Dep. 54:2–9, 55:2–9. In addition to "F.TV," "Fashion TV," and "F. L'Original," defendants' channel is also known to some and sometimes is referred to as "Fashion TV Paris," "Fashion TV," "FTV," "Fashion TV The Original," and "F.TV L'Original" (collectively defendants' " 'Fashion TV' marks"). PX–67; PX–75A; PX–86; PX–113; PX–119; PX–140; DX–T at 43.

Representatives of Chum first met Lisowski in April 1997 at a television industry trade show in France. Lisowski approached Chum's booth seeking to license "FT–Fashion Television" from Chum and to broadcast it on his French channel, which he was then on the verge of launching. Tapp Tr. 272:3–274:3; Lisowski Dep. 83:1–10. Chum explained that "FT–Fashion Television" was already under exclusive license with VH–1, but over the next several weeks Chum and Lisowski entered into negotiations regarding the licensing of "Ooh La La," another fashion program produced and distributed by Chum. PX–134. Negotiations broke down, however, when Chum executives learned that Lisowski was using the name "Fashion Television" in connection with his recently launched fashion channel. PX–135; Tapp Tr. 276:2–279:25. Chum appealed to Li-

sowski, both informally and formally, to refrain from using the name "Fashion Television" to describe his channel. PX–138; PX–58. The parties' attempts to resolve their dispute amicably failed, however, and Chum eventually filed the instant lawsuit.[1]

## DISCUSSION

### A. Legal Standard

The fact that Chum's "Fashion Television" marks are, as Judge Wood found, generic does not preclude a finding that defendants have violated the Lanham Act and the common law by engaging in unfair competition. *See Forschner Group, Inc. v. Arrow Trading Co.*, 30 F.3d 348, 358–59 (2d Cir.1994); *Murphy Door Bed Co. v. Interior Sleep Sys.*, 874 F.2d 95, 102 (2d Cir.1989). As the Second Circuit recently explained, in order to recover on its unfair competition claims Chum must demonstrate by a preponderance of the evidence (1) secondary meaning, *i.e.*, that consumers associate Chum's marks with its program; and (2) a likelihood of confusion. *See Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137, 150 (2d Cir.1997). Additionally, defendants escape liability if the court finds they have "used every reasonable means to prevent confusion as to the source of the products." *Id.* (internal quotation omitted).

### B. Secondary Meaning

■ The essential question with respect to secondary meaning is whether the public is moved to consume a product because of its source. *See PaperCutter, Inc. v. Fay's Drug Co.*, 900 F.2d 558, 564 (2d Cir.1990). A mark acquires secondary meaning when "the name and the business have become synonymous in the mind of the public, submerging the primary meaning of the term in favor of its meaning as a word identifying that business." *Pirone v. MacMillan, Inc.*, 894 F.2d 579, 583 (2d Cir.1990) (internal quotation omitted). The court must determine, in other words, whether the public associates Chum's "Fashion Television" marks with its program in particular or, rather, with the entire genre of fashion-related television programming in general.

Six factors are relevant in evaluating whether a plaintiff's mark has acquired secondary meaning: (1) advertising expenditures; (2) consumer studies linking the mark to a source; (3) unsolicited media coverage of the product; (4) sales success; (5) attempts to plagiarize the mark; and (6) length and exclusivity of the mark's use. *See Centaur Communications v. A/S/M Communications*, 830 F.2d 1217, 1222 (2d Cir.1987); *see also Genesee Brewing*, 124 F.3d at 143 n. 4, 150 n. 16. Although "no single factor is determinative" and "every element need not be proved," establishing secondary meaning entails meeting "vigorous evidentiary requirements," with Chum bearing the burden of demonstrating that its "Fashion Television" marks acquired secondary meaning before defendants' channel was introduced in the United States in 1998. *Thompson Med. Co. v. Pfizer, Inc.*, 753 F.2d 208, 217 (2d Cir.1985). The court will address each factor in turn.

#### 1. Advertising Expenditures

Chum presented copious evidence that over the years it often placed prominent (quarter to full-page) advertisements for its program in leading broadcast journals, such as *Variety, Electronic Media Inter-*

---

1. Chum's original complaint sought both money damages and injunctive relief. Chum subsequently abandoned its claim for dam-ages, however, and currently seeks only injunctive relief.

*national, Television Business International,* and *Broadcasting and Cable International.* PX–35; PX–45; PX–46; PX–122; Tapp Tr. 240:15–256:2. Although there is relatively little evidence in the record about how much money Chum spent on such advertising—until recently it was not Chum's policy to track such expenditures, Cooper Tr. 680:16–681:24—the court has no trouble believing that the expenditures were substantial. PX–36. Chum also routinely attended important broadcast industry trade shows, such as the annual National Association of Television Programming Executives conference. PX–119; PX–126; PX–127.

Importantly, however, the record is almost entirely barren with respect to the extent to which Chum advertised its program *to the viewing public.* Other than a lone advertisement it took out in *Women's Wear Daily,* PX–36, Chum has not pointed to any advertising it has done in periodicals appealing to people other than those in the broadcast and advertising businesses. To be sure, two Chum witnesses testified that the VH–1, E!, and Style networks sometimes ran on-air promotions for "FT–Fashion Television," but neither witness made any attempt to quantify the frequency of such promotions or the size of the audience they reached. Tapp Tr. 238:5–239:7; Helmrich Tr. 393:3–12.[2] Although it is certainly relevant that Chum spent substantial sums of money promoting its program to industry executives, the court finds it at least equally relevant that Chum has not adequately demonstrated it spent much, if anything at all, attempting to promote its program directly to the viewing public.

Chum also points to the fact that Marcia Martin, the senior producer of its pro-

gram, was named an "International Marketing Superstar" in 1993 by *Advertising Age International,* an advertising trade journal. PX–18. The court does not give this fact much weight for two reasons: (1) the journal—which expressly "focuse[d] on executives whose work is concentrated outside the U.S."—clearly was impressed primarily with the way Chum's program had been marketed in Canada, not the United States; and (2) because the award was given in 1993 it sheds no direct light on the extent to which the program was advertised for the bulk of the period at issue—1991 (when Chum's program was introduced in the United States) through 1998 (when defendants' channel was introduced in the United States).

Because Chum engaged in substantial advertising of its program only to people within the industry and not to members of the viewing public, the court finds that this factor weighs against a finding of secondary meaning.

### 2. *Consumer Surveys*

Chum chose not to conduct—or at least chose not to offer into evidence—any consumer surveys measuring the extent to which consumers associate its "Fashion Television" marks with its program. Although the court is well aware that a plaintiff need not prove each and every secondary meaning factor in order to prevail, the court finds it quite significant that Chum, a very large and financially able media corporation, did not muster any survey evidence demonstrating the requisite link in the minds of consumers between Chum's marks and its program. *Cf. Information Clearing House, Inc. v. Find Magazine,* 492 F.Supp. 147, 160 (S.D.N.Y.1980)

---

**2.** Similarly, two Chum witnesses testified that Chum promotes its program on its website, *but neither spoke to the nature or size of the* website's audience. Tapp Tr. 259:13–25; Levine Tr. 493:14–494:3, 537:5–540:8.

(observing, in the likelihood of confusion context, that "[i]t is also significant that plaintiff, although possessed of the financial means, did not undertake a survey of public consumer reaction"). This factor weighs heavily against a finding of secondary meaning.

### 3. *Unsolicited Media Coverage*

Chum's program received considerable media coverage in the United States between 1991 and 1998, including features in a host of newspapers, general interest magazines, and trade journals. PX–10; PX–12; PX–14; PX–15; PX–16; PX–19; PX–20; PX–21; PX–22; PX–23; PX–24; PX–25; PX–27; PX–29; PX–31. Although the court believes that Chum's able public relations department had a behind-the-scenes hand in some of this coverage, the court finds that the unsolicited portion of the media's coverage of "FT–Fashion Television" has been substantial.

Additionally, the court finds that the program's longtime host, Jeanne Beker, has made numerous appearances on other television programs such as "Entertainment Tonight" and "Inside Edition," and that during such appearances she is always introduced as the host of "FT–Fashion Television." PX–31; Martin Tr. 82:17–84:19.

In light of this evidence, the court finds that this factor weighs in favor of a finding of secondary meaning.

### 4. *Sales Success*

There is no question that Chum's program has enjoyed a fair measure of success since it was introduced in the United States in 1991. After all, "FT–Fashion Television" aired on VH–1 from 1992 through 1999, during which time that network reached at least 44 million homes in the United States. PX–17; Martin Tr. 54:6–13, 55:8–10; Tapp Tr. 232:17–20. Since 1999, the program has aired on the E! network, which reaches approximately 45 million homes in the United States. Martin Tr. 60:5–10. The program also currently airs on the Style network. Helmrich Tr. 392:9–21.

Importantly, however, Chum presented no real evidence regarding how many United States viewers *actually watch* its program. It is one thing to say that a program runs on a network that is carried in millions of homes—that is, on a network to which millions of viewers *have access.* But such figures do not speak directly, if at all, to the number of viewers who take advantage of such access by actually watching the program. There is no question that Chum possesses detailed ratings information measuring its United States viewership. The court cannot fathom why Chum chose not to introduce such ratings information into the record, especially given its obvious importance to the secondary meaning inquiry. Nor did Chum present any real evidence regarding the revenues generated by "FT–Fashion Television" in the United States. To be sure, Chum presented bits of anecdotal evidence that its program was one of VH–1's "highest rated" programs and that its United States revenues have been "very significant" and that it is "well known in the trade." Znaimer Dep. 111:14–21; Tapp. Tr. 233:16–19; Chabin Dep. 12:20–23; Helmrich Tr. 384:1–12.[3] Still, the dearth of hard numbers in the record—especially given that Chum undoubtedly has such numbers at its fingertips—is glaring.

---

**3.** Chum also presented evidence that its program is "the most successful Canadian programming product in [that] country's history." PX–17. However, this achievement says nothing about the program's presence *in the United States*—the only market at issue in this case.

Again, the court has no trouble finding that Chum's program enjoys a fair measure of success and that it has reached a substantial number of viewers in the United States. Because Chum chose not to be more specific in its evidentiary presentation, however, the court finds that this factor weighs at most weakly in favor of a finding of secondary meaning.

### 5. *Attempts to Plagiarize*

One Chum witness testified, and the court finds, that at some unspecified point in time a company sought to produce a television program called "Fashion Network Television" using a logo similar to Chum's, and that after Chum protested such use through its attorneys the company chose to change the name of its program. Martin Tr. 88:4–23. Other than this isolated instance, however, the court finds that competitors have not attempted to plagiarize Chum's "Fashion Television" marks.

Given that no more than one competitor has attempted to use a mark similar to Chum's, the court finds that this factor weighs against a finding of secondary meaning.

### 6. *Length and Exclusivity of Use*

The court finds that Chum was the first to use its "Fashion Television" marks in the United States, and that the phrase "Fashion Television" had not been used as the title of a program or the name of a channel prior to Chum's expansion into the United States. Martin Tr. 87:17–20; Znaimer Dep. 92:8–25. Other television programs in the fashion genre use different names, such as "Style with Elsa Klansch," "House of Style," "Fashion Emergency," "Fashion File," and "Behind the Velvet Rope." PX–12; Martin Tr. 89:14–20, 125:25–126:24; Helmrich Tr. 427:23–428:11.

Accordingly, the court finds that this factor weighs in favor of a finding of secondary meaning.

### 7. *Weighing the Six Factors*

It is ultimately a close question whether Chum's "Fashion Television" marks have acquired secondary meaning. Three of the factors—unsolicited media coverage, sales success, and length and exclusivity of use—weigh in Chum's favor, although the sales success factor does not weigh strongly so. Three factors—advertising expenditures, consumer surveys, and attempts to plagiarize—weigh against a finding of secondary meaning, with the consumer surveys factor weighing strongly against such a finding.

In the final analysis, the court is most persuaded by the evidence it has not seen: direct survey evidence that consumers associate Chum's marks with its program, or hard evidence with respect to the size of the program's United States viewership. In light of these key omissions, the court cannot say that Chum has met its burden of demonstrating by a preponderance of the evidence that its "Fashion Television" marks have acquired secondary meaning. Accordingly, the court holds that they have not.

### C. *Likelihood of Confusion*

■ Although Chum's failure to establish secondary meaning is fatal to its unfair competition claims, the court also holds in the alternative that Chum has not proven the requisite likelihood of confusion. In addressing likelihood of confusion, the court must apply the eight factors set forth by Judge Friendly in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir.1961):(1) the strength of plaintiff's mark; (2) the similarity of the parties' marks; (3) the proximity of the parties' products in the marketplace; (4) the

likelihood that the plaintiff will bridge the gap between the products; (5) actual confusion; (6) the defendant's intent in adopting its mark; (7) the quality of the defendant's product; and (8) the sophistication of the relevant consumer group. *See Nabisco, Inc. v. Warner–Lambert Co.,* 220 F.3d 43, 46 (2d. Cir.2000).

The Second Circuit has repeatedly instructed that "[t]he *Polaroid* analysis is not a mechanical measurement." *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 269 F.3d 114, 119 (2d Cir.2001). When conducting a *Polaroid* analysis, "a court should focus on the ultimate question of whether consumers are likely to be confused." *Paddington Corp. v. Attiki Imps. & Distribs., Inc.,* 996 F.2d 577, 584 (2d Cir.1993). In making this determination, a court looks to the totality of the product. *See Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.,* 973 F.2d 1033, 1042 (2d Cir. 1992). Although no one factor is necessarily dispositive, any one factor may prove to be so. *See Nabisco,* 220 F.3d at 46. The test "is not whether confusion is possible," nor is it "whether confusion is probable among customers who are not knowledgeable." *Estee Lauder Inc. v. Gap, Inc.,* 108 F.3d 1503, 1511 (2d Cir.1997). Rather, the test "is whether confusion is probable among numerous consumers who are ordinarily prudent." *Id.*

The court will address each *Polaroid* factor in turn.

### 1. *The Strength of Plaintiff's Mark*

The Second Circuit has instructed that a mark's strength must be measured in two ways: (1) by inherent strength, resulting from the mark's degree of inherent distinctiveness; and (2) by acquired strength, reflecting the degree of consumer recognition the mark has achieved. *See TCPIP Holding Co. v. Haar Communications Inc.,* 244 F.3d 88, 100 (2d Cir.2001); *see*

*also Paddington Corp. v. Attiki Importers & Distribs., Inc.,* 996 F.2d 577, 585 (2d Cir.1993).

Judge Wood previously found that Chum's "Fashion Television" marks are generic—the least distinctive category into which a mark can fall. *See Forschner,* 30 F.3d at 353 (reiterating that marks are categorized, in ascending degree of distinctiveness, as generic, descriptive, suggestive, or arbitrary). As discussed in the previous section, moreover, Chum failed to prove that its marks have achieved secondary meaning in the marketplace.

Because Chum's marks are not inherently distinctive, and because they have not acquired secondary meaning among consumers, the court finds that this factor weighs decidedly against a finding of likelihood of confusion.

### 2. *The Similarity of the Marks*

There is no question that plaintiff's "Fashion Television" and defendants' "Fashion TV" marks are, for the most part, similar. *See Morningside Group Ltd. v. Morningside Capital Group, L.L.C.,* 182 F.3d 133, 140 (2d Cir.1999) (reversing as clearly erroneous district court's finding that the marks "The Morningside Group Limited" and "Morningside Capital Group, L.L.C." were not similar). The fact that Chum sometimes uses the tag line "The Original. The Best." and defendants sometimes use the mark "F. L'Original" only reinforces this conclusion. Indeed, Lisowski himself admitted candidly during his deposition that it is a "foregone conclusion" that the marks "look[ ] similar." Lisowski Dep. 91:12–16.

Defendants argue that the marks at issue should not be deemed similar because their logo is different than Chum's. Defendants are correct that the parties use different logos and that defendants' logo,

which consists of a rather distinctive lower case "f" encapsulated in a diamond, usually is displayed in the upper left hand corner of their channel and website. DX–T; Lemmel Tr. 618:24–619:13; PX–77; DX–KKKK. In this context, however, the court finds that the differences between the parties' logos are not particularly important because television viewers obviously are significantly more likely to associate a show or channel with its name rather than with its logo. Television programming guides, for example, do not reproduce the logo of a program or channel in their listings. PX–32.

Defendants also point to the fact that they often add the word "Paris" to the end of their "Fashion TV" mark as a geographic modifier. This gesture does little to set defendants' marks apart, however, because television channels often refer to their international affiliates simply by adding such geographic modifiers to their regular marks. Tapp Tr. 318:2–321:9 (discussing, for example, "MTV Asia"). For this reason, the mark "Fashion TV Paris" cannot be said to be dissimilar to the mark "Fashion Television" simply by virtue of the addition of the word "Paris." [4]

Though Chum's and defendants' marks are by no means identical, the court finds that in view of the totality of the circumstances this factor weighs in favor of a finding of likelihood of confusion.

### 3. *The Proximity of the Products in the Marketplace*

This factor concerns whether and to what extent the two products compete with each other. It is certainly true—and Lisowski himself readily admitted—that there is some overlap between the audiences that Chum and defendants are seeking to court. Lisowski Tr. 94:1–17. Both sides, after all, are attempting to attract viewers interested in television programming related to fashion.

Applying simple common sense, however, the court finds that the similarities between the parties' respective intended audiences are outweighed by their differences. Chum's program is all about *journalism.* It consists of segments in which reporters seek to educate audience members about a given topic relating to fashion, art, or architecture. The content aired on defendants' channel, on the other hand, is all about *voyeurism.* Defendants' viewers are not seeking to learn anything substantive about the fashion industry, art, or architecture, but rather simply want to watch pretty models strolling down the runway wearing cutting-edge clothing with pulsing music blaring in the background— over and over and over again. The court simply does not believe that a significant number of defendants' viewers have any desire whatsoever to learn, for example, the details of actor Anthony Quinn's latest artistic pursuits. PX–9 (videotape of the January 16, 1999 episode of FT–Fashion Television containing, among other things, an interview with Anthony Quinn about his paintings and sculptures). Because Chum has not offered evidence demonstrating that there actually is significant overlap between its and defendants' audiences, the court finds any possible overlap insubstantial.

Perhaps more importantly, Chum's product is a single television show, whereas defendants' product is an entire television channel. This distinction is critical because television viewers undoubtedly understand the distinction between the individual programs aired on a channel versus the channel itself. This is not to say that

---

**4.** It is not significant that Chum uses "Television" while defendants use "TV," because "TV" obviously is a common abbreviation of "Television." Chabin Dep. 16:6–17:21.

it is impossible that someone tuning into "Fashion TV Paris" the channel could be confused about whether the channel is affiliated with "FT–Fashion Television" the program. Rather, the point is that this additional lack of proximity between Chum's program and defendants' channel makes it less likely that viewers will be confused than if both parties produced a program or both parties operated an entire channel.

Because there is no significant overlap between the audiences of "FT–Fashion Television" and "Fashion TV Paris," and because Chum's product is a program whereas defendants' product is an entire channel, the court finds that the proximity factor weighs heavily against a finding of likelihood of confusion.

### 4. *Bridging the Gap*

This factor involves whether Chum is likely to enter defendants' market, recognizing "the senior user's interest in preserving avenues of expansion and entering into related fields." *Morningside*, 182 F.3d at 141 (internal quotation omitted). Judge Wood held that Chum is not entitled to "bridge the gap" because its mark is generic. *See Chum*, 2001 WL 243541 at *11 (citing *Forschner*, 904 F.Supp. at 1420–23). Chum correctly observes, however, that the portion of the *Forschner* opinion Judge Wood cited does not directly support this proposition, nor is this court aware of any other cases that have so held. Out of an abundance of caution, therefore, the court will assume for purposes of deciding this case that Chum is entitled to rely on "bridging the gap" in order to demonstrate likelihood of confusion.

Chum presented evidence demonstrating that it hopes to launch a 24–hour fashion channel in the United States in the relatively near future. Martin Tr. 92:19–25. Indeed, Chum recently launched a 24–

hour channel called "Fashion Television the Channel" in Canada. Martin Tr. 90:15–92:21; Levine Tr. 542:11–544:5. However, the programming Chum envisions airing on its contemplated 24–hour fashion channel in the United States will be similar to "FT–Fashion Television"— that is, actual magazine-style reporting on fashion-related events, not mere "video wallpaper" of models continuously walking down runways. As such, Chum's plans for the future may well bridge the gap attributable to the fact that its product is a program while defendants' product is an entire channel, but Chum has presented no evidence that it has any plans to bridge the gap that exists with respect to the very different *nature* of the parties' programming.

Because Chum plans to expand its program into a channel that, like defendants', airs 24 hours a day, but because Chum does not plan to broadcast on its channel any programming that compares with defendants', the court concludes that this factor weighs at most weakly in favor of a finding of likelihood of confusion.

### 5. *Actual Confusion*

"Evidence that confusion has actually occurred is of course convincing evidence that confusion is likely to occur." *Morningside*, 182 F.3d at 141. At trial, Chum presented copious evidence of actual confusion among industry professionals. Chum's representatives have been denied access to fashion presentations because officials mistakenly thought they worked for defendants; trade show attendees have mistakenly thought that promotional materials distributed by defendants actually came from Chum; and the designers and fashion house executives Chum seeks to interview often become confused about whether it is Chum that is seeking to

interview them or defendants—to name just a few examples.

Importantly, however, Chum presented no evidence at all that any *consumers* have ever had so much as a moment of confusion with respect to Chum's program and defendants' channel. Nor would the court expect such evidence to exist. As the court has discussed previously, after all, the parties' marks themselves may be confusingly similar, but the actual content of the parties' programming is markedly different. Therefore, while the court has no trouble at all believing that people who hear that "Fashion TV" is at the door might mistakenly believe that "Fashion Television" is at the door, the court does not believe—and Chum has presented no evidence whatsoever demonstrating—that anybody *actually watching* defendants' channel would be at all likely to think that they are watching Chum's program (or vice versa). This is not to say that the evidence of confusion among industry professionals presented by Chum is irrelevant. But it is once again at least equally relevant that there is no evidence at all of actual confusion among viewers.

Because Chum demonstrated actual confusion among industry professionals flowing from the similarity of the parties' names but failed to demonstrate any confusion among viewers actually watching the programs, the court finds that this factor weighs against a finding of likelihood of confusion.

### 6. *Defendants' Intent*

This factor explores whether defendants adopted their marks "with the intention of capitalizing on ... plaintiff's reputation and any confusion between [defendants'] and the senior user's product." *Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 482–83 (2d Cir.1996) (internal quotation omitted).

Defendants presented evidence, and the court believes, that they adopted their "Fashion TV" marks primarily for the simple reason that their product is a TV channel involving fashion. Lisowski Tr. 24:18–25. *See Morningside,* 182 F.3d at 142 (finding good faith because defendant "Morningside Capital" was located on Morningside Drive). The court also notes that defendants properly registered their "Fashion TV" marks with the French trademark authorities prior to launching their channel in the United States. DX–CCCCC; DX–DDDDD; DX–EEEEE.

To be sure, defendants did not do a United States trademark search before launching their channel here. Lemmel Tr. 625:12–22. However, given that Chum's generic marks are not registered trademarks and are not protectable under United States trademark infringement and trademark dilution laws, it is not clear what a good faith actor seeking to use the name "Fashion TV" in the United States would have done upon discovering Chum's use of its generic "Fashion Television" marks. Indeed, this essentially is the central question posed by this litigation. For this reason, the court cannot say that defendants' failure to conduct a United States trademark search demonstrates their bad faith.

The court finds that defendants adopted their marks primarily because they were the best marks for their product, not in order to capitalize on Chum's reputation. Accordingly, this factor weighs against Chum's unfair competition claims.

### 7. *The Quality of Defendants' Product*

Under this factor the court must first examine whether defendants' product is "inferior to plaintiff's, thereby tarnishing plaintiff's reputation if consumers confuse

the two." *Morningside*, 182 F.3d at 142. The quality of the programming on defendants' channel unquestionably is vastly inferior to the quality of Chum's program. Whereas Chum's program features actual reporting on topics relating to fashion, art, and architecture, defendants' channel broadcasts nothing but scantily clad models walking down runways to the beat of club music. Indeed, defendants' own witness testified that United States cable operators are hesitant to carry their channel because of its low production quality, frontal nudity, and overall prurient nature. Rosenberger Tr. 706:10–15; 714:25–717:1. Thus, to the extent that consumers become confused between the two products, there is a very grave risk that Chum's reputation will be tarnished.

As the Second Circuit has recognized, however, "this factor cuts both ways." *Morningside*, 182 F.3d at 142. Just as "[p]roducts of equal quality may tend to create confusion as to source because of that very similarity in quality," *id.*, so too can marked differences in quality ensure that there will be no confusion in the first place. This case presents a perfect example. The quality of Chum's program is so much higher than the "video wallpaper" broadcast by defendants that it is hard to imagine that any viewer watching defendants' channel might mistakenly believe he or she was watching Chum's program. Therefore, although the low quality of defendants' channel cuts in Chum's favor in the first instance, in an important sense this lack of proximity between the parties' products cuts against a finding of likelihood of confusion.

Accordingly, the court finds that this factor is neutral.

### 8. The Sophistication of the Relevant Consumer Group

This factor is "grounded in the belief that unsophisticated consumers aggravate

the likelihood of confusion." *Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 78–79 (2d Cir.1988). As discussed above, all of Chum's actual confusion evidence involved anecdotes of confusion among industry professionals, not ordinary consumers, and it goes without saying that these industry professionals are highly sophisticated actors. And while there undoubtedly is a spectrum of sophistication among the parties' viewers, the court finds that the average consumer is sophisticated enough to understand, at a minimum, the difference between a television program and a television channel. To the extent that there are other ways in which consumer sophistication is relevant to the likelihood of confusion inquiry, the court notes only that Chum has presented no evidence addressing them.

Accordingly, the court finds that this factor weighs against a finding of likelihood of confusion.

### 9. Weighing the Polaroid Factors

Five of the factors—the strength of plaintiff's mark, the proximity of the parties' products in the marketplace, actual confusion, defendants' intent in adopting their mark, and the sophistication of the relevant consumer group—weigh against Chum, the first two strongly so. Two of the factors—the similarity of the parties' marks and bridging the gap—favor Chum, although the latter only weakly so. The quality factor is neutral.

Weighing all of the factors together, the court has no trouble concluding that Chum has not adequately demonstrated the requisite likelihood of confusion. The court finds the most significance in the very salient difference between the nature of the parties' products. Viewing the evidence as a whole, the court simply does not accept that the ordinary consumer

watching defendants' channel likely would believe that he or she actually is watching Chum's program. Chum's unfair competition claims therefore must fail.[5]

### CONCLUSION

For the foregoing reasons, the court concludes that Chum's "Fashion Television" marks have not acquired secondary meaning. In the alternative, the court concludes that Chum has not adequately demonstrated that there is a likelihood of confusion. Accordingly, the court enters judgment in favor of defendants on Chum's unfair competition claims.

SO ORDERED.

---

**5.** Additionally, the court notes that even if Chum were to prevail on its unfair competition claims it still would not be entitled to the relief it seeks—enjoining defendants from using any of their "Fashion TV" marks to identify their channel in the United States. *See* Plaintiff's Proposed Findings of Fact and Conclusions of Law ¶ 123. The Second Circuit has instructed that "[w]here a generic mark is involved, the relief granted should only go so far as to alleviate the source confusion ... and no further." *Genesee Brewing*, 124 F.3d at 151 (internal quotation omitted). A court may require the newcomer "to distinguish its product or to notify consumers explicitly that its product does not come from the original manufacturer" or otherwise " 'to use every reasonable means to prevent confusion,' " but a court *"may not prevent the defendant from using the plaintiff's mark altogether." Id.* (quoting *Kellogg Co. v. Nat'l Biscuit Co.*, 305 U.S. 111, 121, 59 S.Ct. 109, 83 L.Ed. 73 (1938)) (emphasis added).